UNITED STATES of America, Plaintiff,

v.

Thompson B. SANDERS, Daniel Dewey, David Lee Pelleu and Daniel Kolton, Defendants.

No. 88 CR 104.

United States District Court, N.D. Illinois, E.D.

Aug. 17, 1988.

Dan Webb, Winston & Strawn, Steven Senderowitz, Chicago, Ill., for Thompson B. Sanders.

Michael Pasano, Zuckerman Spaeder Taylor & Evans, Coral Gables, Fla., for Daniel Dewey.

Luis Galvan, Asst. Federal Defender, Chicago, Ill., for David Lee Pelleu.

Michael Sher, Chicago, Ill., for Daniel Kolton.

James Conway, Asst. U.S. Atty., Chicago, Ill., for U.S.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Currently before the Court is defendant Thompson B. Sanders' motion to dismiss the superceding indictment. For the reasons noted below, that motion is denied.

### I.[1]

■ Sanders first challenges the wire fraud counts as insufficient under *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), for failure to allege a victim of the wire fraud. While it is true that ¶ 3a of the indictment, which sets forth the scheme, does not set forth the identity of the intended fraud victim, it logically refers to the floor brokers through whom Dewey executed his trades.

■ Under exchange rules, the broker assumes responsibility for any trading losses sustained and not honored by its customers. In the uncommon event that the carrying broker is unable to satisfy those obligations, the firm clearing the trade must pay, and, if it is unable to do so, the loss is to be paid by the clearinghouse of the exchange. P. Johnson, *Commodities Regulation* I § 1.10 at 32 (1982). This is sufficient to satisfy *McNally*. In *United States v. Eckhardt*, the Seventh Circuit found that, although the section of the indictment which charged the scheme did not specify from whom Eckhardt sought to obtain money, it was not fatal because it was clear from the rest of the indictment who the victims were. 843 F.2d 989, 997 (7th Cir.1988). Additionally, the indictment need not allege that the floor brokers were successfully defrauded; it is enough that the scheme was designed to defraud them.

The wire fraud statute can be violated whether or not there is any loss or damage to the intended victim of the crime. *Cf. United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988) ("the mail fraud statute proscribes fraudulent *schemes;* it does not confine penalties to those whose schemes succeed in raking off cash....")

■ Sanders also takes issue with the government's use of the amount "approximately $200,000" in the charging paragraph because, Sanders claims, this is the amount the defendants obtained, but not the amount defendants planned to defraud the brokers of. Under *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and its Seventh Circuit progeny, a scheme that nets the schemers money someway, but not at the expense of a particular victim, is not actionable under the mail fraud and wire fraud statutes. Thus, if the alleged scheme at issue was guaranteed to net those involved money everytime and there was no possible way the brokers or any other victim would ever lose money, it would not be actionable under the wire fraud statute.[2] Judge Holzer received money as a result of his participation in a bribery scheme. However, because the indictment did not allege, nor did the government prove, that the money came from the victims of the fraud, he did not violate the mail fraud statute. *United States v. Holzer*, 840 F.2d 1343, 1346 (7th Cir.1988). This is not, however, what the indictment in this case alleges. It alleges that defendants conspired "to devise and intend to devise a scheme to defraud and obtain money, in an amount of approximately $200,000, by means of false and fraudulent pretenses, representations and promises...." Indictment ¶ 3a. "It was further part of the conspiracy that defendant Daniel Dewey, operating under an assumed name [etc.] would enter restricted trading areas of the Chicago Board of Trade and place deceptive orders to buy or sell Treasury Bond commodities with vari-

---

1. Because the facts in this case are set forth in our earlier opinion, *United States v. Sanders*, 688 F.Supp. 367 (N.D.Ill.1988), we will not repeat them here.

2. Assuming there is not an intangible property interest involved somehow.

ous brokers." Indictment ¶ 10. "[D]efendants ... would then determine whether their deceptive commodity trades and orders were in a position to be profitable to them. The defendants could then decide whether or not to accept or claim a commodity trade and thus engage in no risk trading ... if the deceptive commodity trades were trades which lost money ... defendants had the ability to fail to claim the losing trade and avoid any trading losses. Because of the defendants' use of false identities, disguises and stolen, bogus and counterfeit trading jackets and Chicago Board of Trade identification credentials, the deceptive losing commodity trades and orders could not be traced." Indictment ¶ 11. Again, as we noted earlier, it is irrelevant whether defendants actually avoided any trades that resulted in losses. The crux of the scheme is that they intended to do so. Just because they never *had* to do so because the scheme was detected is not a defense to mail fraud. "Neither the ultimate success of the fraud nor the actual defrauding of a victim is crucial to a successful prosecution." *United States v. Keane*, 522 F.2d 534, 545 (7th Cir.1975). *Accord United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988).

■ Sanders claims the "approximately $200,000" refers to the amount of money defendants obtained through winning trades which they accepted. Thus, he claims the property obtained was not the property of the floor brokers, and, therefore, the indictment fails to charge that victims were defrauded of any property. However, as we demonstrated above, the indictment clearly alleges that defendants intended to defraud the brokers on the losing trades. Thus, the indictment does allege that the scheme intended to defraud victims of money. The $200,000 is just a reference to what defendants were able to get out of the scheme, not what the scheme intended to defraud the brokers of.[3]

## II.

Sanders next argues, for the third time, that the commodities counts are deficient and must be dismissed because the counts do not allege that the defendants falsely represented themselves to customers.[4] In support of this argument, Sanders challenges our alternate holding that the indictment does allege that customers were defrauded. This conclusion was based on our reading of the first indictment that Dewey was posing as the opposite floor broker who entered into a contract to buy or sell a particular commodity contract with another floor broker. This conclusion was based on the following description of commodity trading at the CBT in ¶ 2b of the indictment:

> All commodity trading at the CBT is done in a restricted trading area which is not open to the public. Access to this trading area is restricted by CBT rules to authorized CBT members and employees. When a floor broker enters into a contract to buy or sell a particular commodity contract, the broker must record the transaction on a trading card or endorse an order listing certain information material to the trade such as the commodity traded, the trading price, the time of the trade, the name of the opposite broker and his member firm. The opposite broker also fills out a trading card or endorses an order for the transaction listing the same type of information.

> c. After the brokers fill out the trading cards, the cards are delivered to the brokerage firms of the customer placing the order.

---

3. Sanders also moves to dismiss Count 7 on the grounds that it relies on the wire fraud counts. Because we deny the motion to dismiss the wire fraud counts, we also deny the motion to dismiss Count 7.

4. For the second time, he also argues (in his reply brief) that the defendants never "handled" any orders, which is required to violate 7 U.S.C.

§ 6h (West Supp.1988). Section 6h makes it unlawful to falsley represent oneself "in soliciting or handling any order or contract...." However, as we previously indicated in our June 17, 1988 minute order rejecting Sanders' motion to reconsider our denial of his motion to dismiss, the language of each count tracks the language of § 6h.

d. After receiving the trading cards, the information listed by the floor brokers on the cards is entered by a keypunch operator for the brokerage firm into the computer records of the clearing-house for the CBT.

It was this understanding of the commodity trading process coupled with the description of Dewey's activities on the trading floor that led the Court to conclude that Dewey was acting as a floor broker.

Dewey, operating under an assumed name, wearing a wig and cosmetic disguise and using stolen, bogus and counterfeit Chicago Board of Trade trading jackets and identification credentials would enter restricted trading areas of the Chicago Board of Trade and place deceptive orders to buy or sell Treasury Bond commodities with various victim-brokers. Thereafter, *defendant Daniel Dewey would transfer the trading cards for the deceptive trades to defendant Thompson B. Sanders.*

Indictment ¶ 10.

Because the description of commodity trading set forth earlier in the indictment indicated that only the two opposing brokers had the trading cards until the trading cards were turned over to the brokerage firms of the customer placing the order, the Court concluded that the indictment alleged that Dewey was fraudulently acting as an opposing broker.

However, Sanders points out that in the government's proffer pursuant to *United States v. Santiago,* 582 F.2d 1128 (7th Cir. 1978) (filed subsequent to our opinion), the government sets forth a different scenario. The government states that:

[W]hen the victim-broker dealt with Dewey the victim-broker was deceived into believing that Dewey was a CBOT trading member, whose trade order was properly backed by an established commodity trading firm as well as the required CBOT margin requirements. In reality, defendant Dewey was not a member of any commodity trading firm and his trades were not subjected to any of the applicable CBOT requirements.

(Government's *Santiago* Proffer at 4). Accordingly, if it is not the government's theory that Dewey was acting as the opposite broker, then our alternate conclusion that Dewey misrepresented himself to a customer via the opposite floor trader is no longer relevant to this case.

■ This, however, in no way affects our earlier holding that § 6h is not limited to misrepresentations made only to customers. Sanders, however, is not convinced, and, for the third time, he argues that § 6h is ambiguous and that the legislative history of § 6h shows that it is only intended to make unlawful misrepresentations to customers. Sanders makes no new arguments on this issue, but instead has appended a "declaration" from a private attorney, Jerry W. Markham, purporting to give expert testimony on the legal issue of whether § 6h is intended to cover only misrepresentations made to customers. Needless to say, Mr. Markham concludes that we were incorrect in our conclusion. Ignoring the speculative propriety of Mr. Markham's participation in this case without filing an appearance, we find that he too is incorrect.

Once we wade through Mr. Markham's publication record, we arrive at his legal arguments. He argues that § 6h was only intended to protect public investors from "bucket shop" operators, and he cites some more legislative history to support this view. First, we observe, *again,* that "statutory construction 'must begin with the language of the statute itself,' and '[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' " *Breach Political Action Committee v. FEC,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237–38, 71 L.Ed.2d 432 (1982) (citations omitted). In our earlier opinion, we concluded that § 6h contains a blanket prohibition on false representations made by "any person" in "soliciting" or "handling any orders":

§ 6h. False self-representation as contract market member prohibited.

It shall be unlawful for any person falsely to represent such person to be a

member of a contract market or the representative or agent of such member, or to be a registrant under this chapter or the representative or agent of any registrant, in soliciting or handling any order or contract for the purchase or sale of any commodity in interstate commerce or for future delivery, or falsely to represent in connection with the handling of any such order or contract that the same is to be or has been executed on, or by or through a member of any contract market.

7 U.S.C. § 6h (West Supp.1988). There is absolutely no indication that the prohibition only applies to "soliciting" or "handling" a *customer's order*. Thus, the only way we would read into this statute a limitation to "customer's" orders is if there was "clearly" expressed legislative intention to the contrary. Mr. Markham's clearly expressed legislative intent does not clearly demonstrate legislative intent to limit § 6h to customer misrepresentations, and it is hardly clear that it even says what he claims it says.

▮ His argument is that one of the goals of the original commodities legislation passed in 1920 was to shut down "bucket shops." A bucket shop is a place where bets were placed on the commodity prices. The bets are not executed as contracts on any legitimate exchange, but rather, a bet is placed on the bucket shop's books. Bucket shops were sought to be stopped because they constituted gambling institutions. The distinction between a bucket shop transaction and a legitimate transaction hinged on whether the trade was executed on the floor of the exchange. Prior to its amendment in 1983, § 6h had two sections, § 6h(1) and § 6h(2):

§ 6h. Dealing other than through member of contract market

It shall be unlawful for any person—

(1) to conduct any office or place of business anywhere in the United States or its territories for the purpose of soliciting or accepting any orders for the purchase or sale of any commodity for future delivery, or for making or offering to make any contracts for the purchase or sale of any commodity for future delivery, or for conducting any dealings in commodities for future delivery, that are or may be used for

(A) hedging any transaction in interstate commerce in such commodity or the products or by-products thereof, or

(B) determining the price basis of any such transaction in interstate commerce, or

(C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof, if such orders, contracts, or dealings are executed or consummated otherwise than by or through a member of a contract market; or

(2) falsely to represent such person to be a member of a contract market, or the representative or agent of such member, or to be a futures commission merchant registered under this chapter, or the agent of such registered futures commission merchant, in soliciting or handling any order or contract for the purchase or sale of any commodity in interstate commerce or for future delivery, or falsely to represent in connection with the handling of any such order or contract that the same is to be or had been executed on, or by or through any member of, any contract market.

7 U.S.C. § 6h(1) and (2) [§ 6h(1) repealed 1983, § 6h(2) amended 1983]. Mr. Markham in support of his theory that the entire § 6h (prior to its repeal and amendment) was intended to deal with bucket shops cites a colloquy in the legislative history of the later held unconstitutional Futures Trading Act of 1921 between Congressman Gilbert N. Haugen, Chairman of the House Committee on Agriculture, and Mr. E.A. Calvin of Houston, Texas. Mr. Calvin was a cotton grower. Mr. Calvin testified about the practice of bucket shops. There was no mention of the statute. Later, when Congress was preparing to enact the Commodity Exchange Act in 1935, § 4g (later redesignated § 4h and codified as 7 U.S.C. § 6h) was referred to as the anti-bucket shop prohibition. *See Regulation*

*of Grain Exchanges, Hearings Before the House Committee on Agriculture* on H.R. 8829, 73rd Cong.2d Sess. 119 (April 12, 1934). This is the sum total of Mr. Markham's demonstration from the legislative history of § 6h that it clearly was intended only to prohibit misrepresentations made to customers. This brings us back to the first requirement that must be met before we will read something into a statute which is not present, that is, there must be clearly expressed congressional intent. Just because a prior version of § 6h was referred to as a "bucket shop" prohibition, it does not mean that Congress intended that the second section of the old § 6h should only apply to misrepresentations made to customers. Logically, such an argument would also justify an interpretation that § 6h would only prohibit misrepresentations made to customers in connection with a bucket shop operation. Just as we find no justification in the statute or legislative history for that reading, we find no justification for the reading advanced by Mr. Markham.

Finally, and most conveniently, we note that Mr. Markham barely examines the most recent legislative history of the present § 6h. It is under this version that Sanders has been charged. In 1982, Congress removed the first part of § 6h. Part two of the old section 6h, § 6h(2) was left by itself and was broadened to prohibit misrepresentation as to status by any registrant under the Act. H.R. No. 97–565(1) 97th Cong. 2d Sess. 143, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3871, 3992 ("H.Rep. 565(1)"). S.Rep. No. 97–384, 97th Cong.2d Sess. 87 ("S.Rep. 384"). In all the references to the new § 6h, there is no indication that the misrepresentation is to be limited only to off-exchange practices. *See* H.Rep. 565(1) at 29, 87, 143, Sen.Rep. 384 at 86. Rather, it seems clear that the restructuring of § 6h in 1982 reflects congressional belief that the previous §§ 6h(1) and 6h(2) are not dependent upon one another and that they address individual issues. This is reflected by the language used in the legislative history of the 1982 amendments to discuss the present § 6h. The House Report sets forth a summary of the Futures Trading Act of 1982. In reference to the present § 6h, it states the following under a section labeled *"Extension of antifraud and misrepresentation provision"*:

(1) Extends the antifraud provisions [of § 6o] that now apply to commodity trading advisors and commodity pool operators to cover as well associated persons of commodity trading advisors and commodity pool operators.

(2) *Extends prohibition against misrepresentation of registration or contract market membership status [in § 6h] to any registrant, including the representative or agent of any registrant.*

H.Rep. 565(1) at 29, 1982 U.S.Code Cong. & Admin.News at 3878 (emphasis added). First, we observe that § 6h is referred to as the "misrepresentation provision" which in no way reflects a limitation as to off-exchange practices. Additionally, we observe that this summary demonstrates that Congress looked and considered the 1982 amendments of § 6h and § 6o together. *See* H.Rep. 595(1) at 87–88 and 90 (setting forth a section-by-section description of the amendments to § 4h of the Act [codified at 7 U.S.C. § 6h] and § 4o [codified at 7 U.S. C. § 6o]). Furthermore, in the subcommittee markup section of H.Rep. 565(1), there is another discussion of § 4h [7 U.S.C. § 6h] and § 4o [7 U.S.C. § 6o] together:

#### 4. *Technical Amendments*

(a) *Misrepresentation*—The Committee took up a proposal in H.R. 5447 that would extend the prohibition against misrepresentation of a person's status to apply to any registrant under the Act, including the representative or agent of any registrant, and extend the antifraud provisions of section 4o to apply to the associated persons of commodity trading advisors and of commodity pool operators.

H.Rep. 565(1) at 143, 1982 U.S.Code Cong. & Admin.News at 3992. We mention this because it supports our earlier conclusion that had Congress intended to restrict § 6h to only prohibit misrepresentations made to "customers" as Sanders contends, it presumably would have done so expressly as it did in § 6o. Section 6o makes it unlawful to employ a scheme to defraud "any client

or participant or prospective client or participant," or to engage in any transaction, which operates as a fraud upon "any client or prospective client or participant." 7 U.S.C. § 6o. In our earlier opinion, we acknowledged that, because § 6h and § 6o were added to the Commodity Exchange Act at different times, § 6h in 1936 and § 6o in 1974, the statutory construction presumption that where Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded[5] might not seem to apply with as much force. However, we noted that because they were amended together in 1982, we felt the general rule was still relevant. This summary and the subcommittee markup discussions in the legislative history of the 1982 amendments demonstrates that Congress specifically considered the two sections together and could have expressed a limitation in § 6h if it had so intended.

In summary, we reaffirm for the final time that there is no limitation in § 6h that would only prohibit misrepresentations made to customers, and there is also no "clearly" expressed legislative intention to the contrary.[6]

### Conclusion

We reject Sanders' *McNally* challenge to the wire fraud counts because the indictment specifically alleges a scheme to obtain money at the expense of the floor brokers with whom defendants placed orders. We also reject Sanders' challenge to the commodity counts because we conclude the indictment properly alleges a violation of 7 U.S.C. § 6h. For these reasons, Sanders' motion to dismiss the superceding indictment is denied. It is so ordered.

---

**5.** *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972).

**6.** Sanders argues that the commodities counts should be dismissed because they are based on violations of CBT rules which he contends are actionable under the Commodity Exchange Act. The government did not specifically address this argument, however, as we read the commodities counts, they do not rely in any way upon the violations of the CBT rules. Each of those counts are self-contained and do not incorporate any other part of the indictment by reference. Thus, there is no reason to conclude the government is relying upon the rule violations to set forth a violation of § 6h. Accordingly, we reject Sanders' argument on this issue.