United States Court of Appeals,

Fifth Circuit.

No. 91–4454.

Theodore PURDY, et al., Petitioners,

v.

COMMODITY FUTURES TRADING COMMISSION, Respondent.

Aug. 17, 1992.

Appeal from a decision of the Commodity Futures Trading Commission.

Before BROWN, KING and WIENER, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This dispute arose from a complaint to the Commodity Futures Trading Commission ("CFTC" or "Commission") by an elderly investor who lost a fortune investing (one might say gambling) in precious metal leverage contracts. After a judgment for the broker house by an Administrative Law Judge ("ALJ"), and subsequent summary affirmation by the Commission, the investor appeals to this court. Finding his complaints more at issue with the present state of the law, and not with any actual violations, we affirm the decision of the Commission.

The Road to Las Vegas

Theodore Purdy Sr.[1] is a self-employed businessman who sold his fifty-year-old auto parts business and retired in 1983. At the time of his retirement, Purdy's business grossed $1.5 million annually, and he paid himself approximately $150,000 a year. Both he and his son, Theodore Purdy, Jr., have high school educations and, prior to their first dealings with Monex International ("Monex"), had no investing experience.

In 1972, Purdy started buying Krugerrands from Monex with cash, and stored the coins under

---

[1]Theodore Purdy Sr. will be referred to as "Purdy." Teddy Purdy Jr. will be "Theodore Purdy, Jr." The two combined will be "Purdys."

his kitchen sink. By 1980, he had purchased over 1,100 Krugerrands and some silver bars, all stored under the sink. At this time John Mullins, one of Monex' account representatives, informed Purdy about precious metal leverage accounts.

## The Rules of the Game

Leverage contracts arrived in the late 1960s and early 1970s as a way for individual investors to purchase precious metal coins or bars from coin dealers on a credit basis.[2] An investor paid down 20–30 percent of the full purchase price plus sales commissions, and signed a credit agreement for the balance, which stipulated interest rates and the possibility of margin calls if the commodity price dropped.[3]

Investment houses promoted leverage contracts as a hedge against inflation for individuals who found futures markets undesirable. Futures require larger investments, are more volatile, and are short-term in nature.[4]

In 1974, Congress amended the Commodities Exchange Act[5] ("CEA" or "the Act") to establish the CFTC.[6] The CFTC received exclusive jurisdiction over transactions involving "contracts of sale of a commodity for future delivery." 7 U.S.C.A. § 2 (West Supp.1992). This exclusive

---

[2]*See Hearings on S. 2485, S. 2837, and H.R. 13113 Before the Senate Comm. on Agriculture, Nutrition, and Forestry,* 93d Cong.2d Sess., pt 3 at 748 (1974) (Statement of M. Martin Rom, Chairman, International Precious Metals Corporation).

[3]*Hearings on S. 2391 Before Subcomm. on Agricultural Research and General Legislation of the Senate Comm. on Agriculture, Nutrition, and Forestry,* 95th Cong., 2d Sess. 625 (1978) (statement of International Precious Metals Corporation). *Hearings on H.R. 10285 Before the Subcomm. on Conservation and Credit of the House Comm. on Agriculture,* 95th Cong., 2d Sess. 719 (1978) (statement of International Precious Metals Corporation).

[4]*Id.*

[5]Commodity Exchange Act, ch. 369, § 1, 42 Stat. 998 (1922); ch. 545, § 1, 49 Stat. 1491 (1936) (codified as amended at 7 U.S.C.A. §§ 1–24 (West 1980)).

[6]Commodity Futures Trading Commission, Pub.L. No. 93–463, 88 Stat. 1389 (codified as amended in scattered sections of 5 U.S.C.A. (West 1980) and 7 U.S.C.A. (1980)).

jurisdiction included regulation of leverage transactions in gold and silver bullion and bulk coins. 7 U.S.C.A. §§ 2, 15a (§ 15a repealed 1978) (West Supp.1992). Additionally, 7 U.S.C.A. § 15a allowed the Commission to regulate any leverage contract it determined to be a contract for future delivery.

In 1978 Congress replaced 7 U.S.C.A. § 15a with 7 U.S.C.A. § 23(b) (West 1980), *amended by* 7 U.S.C.A. § 23(b) (West Supp.1992).[7] This legislation reinforced the Commission's authority to regulate, as futures, any leverage transaction it determined to be a futures contract. 7 U.S.C.A. § 23(d) (West 1980), *amended by* 7 U.S.C.A. § 23(b) (West Supp.1992).

The Commission has periodically exercised its regulatory powers over leverage contracts. In 1975, it adopted Rule 30.03 (now Rule 31.3) to prohibit fraud in leverage transactions.[8] In 1979

---

[7]Futures Trading Act of 1978, Pub.L. No. 95–405, § 23, 92 Stat. 865, 876–877 (1978). The Senate Report accompanying the bill that was eventually enacted identified the following characteristics of leverage contracts:

> (1) standard units, quality, and terms and conditions; (2) payment and maintenance of "margin"; (3) closeout by an offsetting transaction or by delivery, after payment in full; and (4) no right or interest in a specific lot of the commodity. The leverage dealer is the principal to every transaction and functions as a market maker. The leverage dealer, however, does not guarantee a repurchase market and further reserves the right to cease operating as a market maker or broker for the customer. Most customer commitments are covered or "hedged" in futures, forwards, or physical inventory; most physical inventory, however, is encumbered through bank loans. Leverage contract bid/ask prices are determined by dealer adjustments to spot and futures market quotations.

S.Rep. No. 850, 95th Cong., 2d Sess. 26 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2114.

[8]The rule states in relevant part:

> It shall be unlawful for any person ... (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit ... a material fact necessary in order to make the statements made in the light of the circumstances ... not misleading, or (c) To engage in any [conduct] which operates ... as a fraud ... in connection with (1) an offer to make or the making of, any transaction for the purchase, sale or delivery of [gold and silver bullion or bulk coins] ... pursuant to ... a margin account, margin contract, leverage account, or leverage contract ... or (2) the maintenance or carrying of any such contract.

the Commission imposed a moratorium on the entry of new firms offering leverage contracts. 17 C.F.R. §§ 31.1, 31.2 (1986).[9] Firms actively selling leverage contracts prior to June 1, 1978 were allowed to continue. *Id.*

In 1982, Congress amended the Act, directing the Commission to establish regulations for "leverage transaction merchants" handling gold and silver bullion and bulk coin transactions.[10] Congress also required the Commission to regulate leverage contracts as an entirely separate class of transactions, distinct from futures contracts.[11]

In 1984, the Commission adopted their final rules, codified at 17 C.F.R. Part 31. Part 31 defined a leverage contract, and also prescribed disclosure, minimum net capital, and cover requirements. The Commission also continued the moratorium on the entry of new firms, and required registration of existing firms, including Monex.

## The Casino

Monex is a registered leverage transaction merchant ("LTM") and commodity trading advisor ("CTA"). John Albrecht is a registered associated person ("AP") of Monex.[12] Monex has actively

---

17 C.F.R. § 31.3.

[9]All references to 17 C.F.R. are to the 1986 edition unless noted otherwise, as this edition contains the applicable CFTC rules relevant to this dispute.

[10]Futures Trading Act of 1982, Pub.L. No. 97–444, § 234, 96 Stat. 2294 (codified as amended at 7 U.S.C.A. § 23 (West Supp.1992)).

[11]*Id.*

[12]"Leverage transaction merchant" is defined in 17 C.F.R. § 1.3(oo) as "any individual, association, partnership, corporation, trust or other person that is engaged in the business of offering to enter into, entering into or confirming the execution of leverage contracts, or soliciting or accepting orders for leverage contracts and who accepts leverage customer funds (or extends credit in lieu thereof) in connection therewith."

A "Leverage contract" is defined in 17 C.F.R. § 31.4(w) as:

a contract, standardized as to terms and conditions, for the long-term (ten

bought and sold leverage contracts on precious metals since 1967.[13] Monex operates like a typical LTM as regulated by the Act. It buys and sells precious metals for individuals, either on a credit or cash basis. Monex acts as a principal, not broker, for these transactions, and bases its prices on world market conditions. If a buyer pays full price, then Monex delivers the actual precious metals to the customer. If, however, the buyer elects a credit plan, then Monex establishes a ten year purchase

> years or longer) purchase ("long leverage contract") or sale ("short leverage contract") by a leverage customer of a leverage commodity which provides for:
>
> (1) Participation by the leverage transaction merchant as a *principal* in each leverage transaction;
>
> (2) Initial and *maintenance margin payments* by the leverage customer;
>
> (3) Periodic payment by the leverage customer or accrual by the leverage transaction merchant of a *variable carrying charge* or fee on the unpaid balance of a long leverage contract, and periodic payment or crediting by the leverage transaction merchant to the leverage customer of a variable carrying charge or fee on the initial value of the contract plus any margin deposits made by the leverage customer in connection with a short leverage contract;
>
> (4) Delivery of a commodity in an amount and form which can be readily purchased and sold in normal commercial or retail channels;
>
> (5) Delivery of the leverage commodity after satisfaction of the balance due on the contract; and
>
> (6) Determination of the contract purchase and repurchase, or sale and resale prices *by the leverage transaction merchant.*

> "Commodity trading advisor" is defined in 17 C.F.R. § 1.3(bb) as "any person who, for compensation or profit engages in the business of advising others as to the value of or the advisability of trading in any [futures contract] ... or any leverage transaction ... or who for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the foregoing."

> "Associated person" of an LTM is defined in 17 C.F.R. § 1.3(aa)(5) as an employee or agent "in any capacity which involves: (i) the solicitation or acceptance of leverage customers' orders ... for leverage transactions...." (emphasis added).

> "Carrying charges for a leverage contract" are defined in 17 C.F.R. § 31.4(1) as: "all service and *interest* changes (sic) paid periodically by a leverage customer to a leverage transaction merchant, while a long leverage contract remains open."

[13]For a general description of Monex's business operations similar to the operations here at issue, *see Moody v. Monex Int'l, Ltd.* [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,714, 1980 WL 1467 (D.Utah 1980).

contract; financing the balance while the buyer pays periodic interest charges. Monex covers its physical delivery obligations by maintaining inventory, and trading in the futures market.

Monex operated as an LTM prior to June 1, 1978; therefore it was not affected by the moratorium on new firms selling leverage contracts. In 1984, when registration became a requirement, all existing LTM's had to apply for registration before April. Monex filed its registration application in August. The CFTC instituted action against Monex to enforce the application requirement. While the CFTC reviewed Monex' application, it granted Monex the privilege of continuing to operate as an LTM. This was standard practice while the Commission made a final determination on an LTM's registration application. Albrecht, as an AP, also filed a tardy registration application, and the Commission treated him in the same manner as Monex.

## The Play

In 1980, Purdy began leveraged investing with Monex. At that time, John Mullins handled Purdy's accounts. For each leveraged transaction made, Purdy received a Commodity Account Agreement, which he signed and returned to Monex, and an Offering Statement (essentially a risk disclosure statement). He bought silver bars on the margin, and within two months, he lost about $14,000. He closed out these accounts, but continued to buy metals from Monex at full price. In 1982, John Albrecht began handling Purdy's accounts for Monex.

Purdy sold his business in 1983, and decided to use all or some of the proceeds to purchase leverage contracts from Monex again, although this time on a much larger scale. Purdy believed that, despite his early losses, precious metals provided the best hedge against the inflationary times that certainly would prevail in the 1980's. His strategy was to use some precious metals stored under the sink[14] as starting capital. He then could invest in as much gold and silver as possible by trading on

---

[14]This was in no sense a sinking fund. Rather it was the customary storage place for Purdy's securities, metals, etc.

the margin, thus maximizing profits. The money saved by leveraging, and the proceeds thereof, would support his living expenses, he contemplated.

Purdy opened twelve accounts for the purpose of executing his investment plan.[15] Some he bought on the margin. Others he paid full price for the metal, then immediately used the metal as collateral for a loan from Monex, effectively turning these transactions into margin accounts as well. Early in 1983, he suffered huge losses in three days when the price of silver dropped by fifty percent overnight.[16] Rather than cut his losses, Purdy continued to invest heavily; delving deeper into his metals stored at home under the sink and obtaining loans from Monex on other, more profitable, accounts. Purdy testified that he believed "the metal market will come back," and he felt that "[i]f I get something I believe in I will stay with it." Throughout 1983 and 1984, Purdy continued to lose money.

When 1985 began, losses in Purdy's accounts exceeded $1,250,000. Purdy asked Albrecht what could be done to stop the financial hemorrhage. Albrecht suggested hedging long investments with short investments, but tempered his advice with the caveat that although short postures would stop losses, they would prevent gains as well.[17] Purdy then bought some short contracts.

---

[15]From 1980 until 1985, when he stopped investing, Purdy opened twelve accounts with Monex. The record reflects that for each one, he received and signed a Commodity Account Agreement, and received the current Offering Statement. Executing these signed Commodity Account Agreements was a prerequisite to Monex's dealing with Purdy; if Purdy would not sign and return them, Monex would not sell to Purdy. Purdy had total control over each account, and made all investment decisions, sometimes after consulting with family.

[16]The record conflicts as to the exact amount of these losses, but they were at least as high as $75,000 and may have been in excess of $290,000.

[17]Prior to 1985, Purdy purchased long leverage contracts. In layperson's terms, "long" means the investor speculates that the price will go up over time. The investor hopes to buy low now, and sell high later, although not necessarily ten years later as is the term for a standard leverage contract at Monex. "Short" means the investor wants the price to go down over time. The investor then "sells" a leverage contract to Monex, and "buys" it back at a lower price later, thus making a profit (assuming the price did actually decrease over time).

In March of 1985, news wire services reported the possibility of Brazil's default on foreign bank loans. Albrecht called Purdy and stressed to him that Brazil's default could increase the price of silver. Albrecht explained that Purdy's short positions would inhibit profits should the price of silver rise due to Brazil's default. Purdy authorized Albrecht to sell most of the short contracts, but when Brazil did not default, Purdy did not immediately reinstate his short hedges. Purdy bought short again in July 1985, but then closed all accounts with Monex in September 1985.

In sum, from 1980 through 1985 Purdy sent $1,313,323 to Monex, but he withdrew $675,614 in the form of precious metal or funds. Monex charged him $217,934 in interest for the leverage accounts he maintained at Monex.

Almost a year after closing his accounts Purdy filed a reparation complaint with the Commission. After two failed attempts to file a complaint that alleged a specific violation and actual damages suffered, Purdy obtained new counsel through the assistance of the Commission. The second amended complaint charged Monex with bucketing, fraud, and numerous violations of the CEA and the Rules of the CFTC.

After Herculean discovery efforts by both sides, a hearing was held before an ALJ in Houston, Texas, in December 1987. Counsel represented both sides; presenting evidence and cross-examining witnesses. The ALJ issued his Initial Decision ("ID") on June 29, 1988,[18] concluding that Purdy failed to establish by a preponderance of the evidence any actual violations by Monex. The ALJ summarized the case as follows:

> In truth, Purdy knew at all times that he could simply exit the market and stop his losses. But Purdy wanted to remain in the "game." Purdy knew as early as March 1983 that he had lost substantial sums of money. Later he increased his exposure to risk. Nothing in this record shows that his account executive, Albrecht, or any other employee or officer of Monex exerted undue pressure on Purdy to maintain his positions with Monex. To his credit, Purdy

---

[18]*Purdy v. Monex Int'l, Ltd.,* CFTC Docket No. 86–R244, 1988 WL 228733 (June 29, 1988).

has made it clear throughout this proceeding that he made all of the decisions regarding trading on the accounts.

The truth is Purdy believed precious metals prices would escalate in the 1980's. And had precious metals prices soared in 1983, 1984, and 1985, this case would not be in litigation. Purdy would have recovered his losses, and might well have made a substantial profit.

Purdy filed a proper and timely notice of appeal with the Commission in July of 1988. On May 20, 1991 the Commission affirmed the ID without opinion, as allowed by 17 C.F.R. § 12.406(b).[19] Purdy then filed a timely petition for review with this court. 7 U.S.C.A. §§ 6(b), 9, and 18(e) (West Supp.1992).


Standard of Review:

Section 18(e) of Title 7, U.S.C.A., states that review of any order from the Commission "shall be reviewable on petition ... by the United States Court of Appeals. 7 U.S.C.A. § 18(e) (West Supp.1992). The court will then have the power to "affirm, to set aside, or modify the order of the Commission, and the findings of the Commission as to the facts, if supported by the weight of evidence, shall ... be conclusive." 7 U.S.C.A. § 9 (West Supp.1992).[20] The question thus arises: what level of appellate scrutiny do we apply to the Commission's order?

---

[19]The Commission's Order in relevant part states:

> Review of the record and the briefs submitted by the parties establishes that the result reached in the initial decision is substantially correct. Because we also conclude that the parties have not raised important questions of law or policy that merit discussion, we are affirming the initial decision without opinion. In taking this action, we do not endorse either the precise legal theory applied by the presiding officer or the specific reasoning reflected in the initial decision. Accordingly, the initial decision shall neither be cited as Commission precedent in any Commission proceeding nor deemed an expression of the Commission's views on the issues raised in this case.

[20]Words identical to these are found in other laws allowing judicial review of administrative proceedings. *See, e.g.,* 15 U.S.C.A. § 45(c) (West 1973); ("The findings of the Commission as to the facts, if supported by the evidence, shall be conclusive."), 29 U.S.C.A. § 210(a) (West Supp.1992); ("[F]indings of fact ... when supported by substantial evidence shall be conclusive."), 29 U.S.C.A. § 160(e) (West Supp.1992); ("[F]indings of the Board ... if supported by substantial evidence ... shall be conclusive.").

The Supreme Court has held such language to require support by "substantial evidence." *Washington, Va., Md. Coach Co. v. NLRB,* 301 U.S. 142, 147, 57 S.Ct. 648, 659, 81 L.Ed. 965, 970 (1936).[21] This means that the relevant evidence would suffice so that "a reasonable mind might accept [it] as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126, 140 (1938).

Recent decisions have held the standard to be a "preponderance" or "greater weight" test. *Kent v. Hardin,* 425 F.2d 1346, 1349 (5th Cir.1970), *Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir.1977), *Dohmen–Ramirez v. CFTC,* 837 F.2d 847, 856 (9th Cir.1988). This does not suggest that an appellate court should reweigh the evidence to see which party the evidence favors. Instead the court should "review the record with the purpose of determining whether the finder of fact was justified, *i.e.* acted reasonably in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings." *Haltmier,* 554 F.2d at 560.

Both the "substantial evidence" and "preponderance" tests require essentially the same review. A court of appeals does not re-evaluate the evidence, but goes beyond the "scintilla" test, *Consolidated Edison,* 305 U.S. at 229, 59 S.Ct. at 217, 83 L.Ed. at 140, to determine if the Commission's (or its designee, the ALJ's) conclusions based on the facts were justified.

Petitioner contends *de novo* review is required because the Commission did not expressly adopt the ALJ's opinion and findings, *see supra* note 19; therefore the Commission's summary affirmance doesn't have the status of a final decision. This contention is groundless simply because

[21]In general, judicial review of the Commission's final rulings are governed by the Administrative Procedures Act ("APA"). The APA applies to all administrative agencies, including the Commodity Futures Trading Commission. 5 U.S.C. § 701 (West 1977). When a court reviews agency action, the court shall "(2) hold unlawful and set aside agency action, findings, and conclusions found to be ... (E) Unsupported by substantial evidence in a case subject to sections 556 and 557 of this title." 5 U.S.C.A. § 706 (West 1977). A hearing before an ALJ is controlled by 5 U.S.C.A. §§ 556 and 557 (West 1977).

the APA states that "an initial decision ... becomes the decision of the agency." 5 U.S.C.A. § 557(b) (West 1977).

In addition, the CFTC rules say if the Commission summarily affirms the initial decision of the ALJ, as it did here, then it may order without opinion, and the order becomes the Commission's final decision. 17 C.F.R. § 12.406(b).

Purdy further asserts that because the Commission declined to review the ALJ's decision, we should do so *de novo*. This argument lacks foundation as well since the Commission's order of summary affirmance states "*[r]eview* of the record and the brief ... establishes that the result reached ... is substantially correct." (emphasis added) Although the Commission did not endorse "the precise legal theory" or "specific reasoning" of the ALJ's ID, the Commission held the legal and policy issues to be undeserving of further discussion. The Commission, therefore, affirmed without an opinion, pursuant to 17 C.F.R. § 12.406(b).

Lastly, despite Purdy's claim that *de novo* review is warranted because the ALJ wholly adopted the Respondent's proposed findings of fact, we find the record reflects ample examples of the ALJ's independent findings of fact. Petitioner labels such wholesale adoption of Respondent's proposed findings of fact as arbitrary and capricious. He cites *Pennzoil v. FERC,* 789 F.2d 1128, (5th Cir.1986) and *NLRB v. Brooks Cameras,* 691 F.2d 912 (9th Cir.1982) to support his contention that when an agency fails to consider all factors and provide a reasoned basis for the agency's decision, *de novo* review is warranted. These cases, however, ruled on facts where the Commission's findings did not agree with the ALJ's. In such a case, the appellate court should make a more searching review. Here, the ALJ and Commission agree on the findings, and so a substantial evidence review is warranted.

Substantial evidence reflects deference to the expertise of an administrative agency in the

highly complex area of commodities regulation. Such review is somewhat comparable to the deference given to a jury. "In the case of the jury, it offers the common wisdom of numbers—large numbers of decision makers not jaded by formal daily contact with the law. The agency offers the specialized wisdom of expertise—decision makers supposedly expert in the minutiae of the immediate subject matter." 2 St even A. Childress & Martha S. Davis, *Standards of Review* § 15.4, at 273 (1986).

We view our task here as a search for substantial evidence in the record that would reasonably uphold the factual findings of the ALJ.

Proximate Cause

The CFTC designated the ALJ to hold a hearing for reparations regarding Purdy's complaint. Reparation proceedings are for "[a]ny person complaining of any violation of any provision, ... rule, regulation, or order issued pursuant to this chapter, by any person who is registered under this chapter." 7 U.S.C.A. § 18(a) (West Supp.1992). The complainant may "at any time within two years after the cause of action accrues, apply to the Commission for an order awarding *actual damages proximately caused* by such violation." 7 U.S.C.A. § 18(a) (West Supp.1992) (emphasis added).

Although not defined in the statute, majority common law (including Texas, Purdy's residence at the time of the transactions at issue here), defines proximate cause as: (1) cause in fact ("but for" causation), and (2) foreseeability. *In re Air Crash at Dallas/Fort Worth Airport,* 919 F.2d 1079, 1085 (5th Cir.1991), *cert. denied sub nom. Connors v. United States,* —— U.S. ——, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991), *Urbach v. United States,* 869 F.2d 829, 831 (5th Cir.1989), *Pope v. Rollins Protective Serv. Co.,* 703 F.2d 197, 202 (5th Cir.1983).[22]

---

[22]Other courts hold to similar definitions. The Ninth Circuit interpreted causation in the context of the Home Owners' Loan Act (HOLA) of 1933 (as amended in 1982: "Any person may sue for and have injunctive relief ... against threatened conduct that will *cause* loss or damage...." 12 U.S.C.A. § 1464(q)(2)(A) (West 1989) (emphasis added)) as "requir[ing] that the wrongful conduct be both the *factual* and legal cause of the injury." *Sundance Land v. Community First*

The ALJ was the designated fact finder for Purdy's reparation proceeding.  Thus, under the substantial evidence standard of review, if the ALJ found Purdy sustained no injuries caused in fact by the respondent-intervenor's alleged CEA violations, then we must find substantial evidence to support the ALJ's findings as to proximate cause.

The ALJ based much of his decision on weighing the conflicting testimony given by both Monex and the Purdys.  As finder of fact, he sat in the best position to evaluate the credibility of the witnesses, their demeanor, and their testimony.  After hearing all the oral statements, and reviewing a "huge record," the ALJ came to a crucial core conclusion which permeates this entire case: "Complainant's losses were not caused by any wrongdoing on the part of Respondents.  Rather, those losses resulted from Complainant's intractable belief that precious metals prices would increase in the 1980's."  In order to evaluate the ALJ's conclusions on causation and breach of statutory requirements, we will now review the evidence regarding Petitioner's specific allegations.

Interest

Purdy contends Monex fraudulently charged interest, resulting in Monex' unjust enrichment. Purdy relies on a CFTC staff study characterizing interest on unpaid margin balances as "preposterous" because no loan is made to company customers.[23]

Furthermore, Purdy characterizes his debt to Monex as a demand obligation which therefore precludes interest charges. *Steingut v. Guaranty Trust Co. of N.Y.,* 161 F.2d 571 (2d Cir.1947) *cert. denied* 332 U.S. 807, 68 S.Ct. 106, 92 L.Ed. 385 (1947).  However, in *Steingut,* the interest paid on

---

*Fed. Sav. & Loan,* 840 F.2d 653, 662 (9th Cir.1988) (emphasis added).  The Eighth Circuit says proximate cause "exists if injury would not have occurred but for negligence, injury was natural and probable result of negligence, and there was no efficient intervening cause." *Rule by Rule v. Lutheran Hosp. & Homes Soc. of Am.,* 835 F.2d 1250, 1251 (8th Cir.1987).

[23]"Report for the CFTC:  Trading at Leverage Contracts for Gold and Silver" Project 217 (April 18, 1975).  The study and its findings have never been adopted by the CFTC, or used as grounds for any ALJ or Commission decision.

demand deposits was prohibited *by statute.* 12 U.S.C.A. § 371(a) (West 1989). No such statutory

prohibition exists here. In fact, Congress has implicitly allowed LTM's to charge interest. *See supra*

note 2. In addition, the Commission's rules recognize interest charges in leverage contracts. *See*

*supra* note 12. Monex' interest charges were consistent with Congress' intentions prior to the

implementation of the CFTC rules, and they were in compliance with the rules when they came into

effect in 1984. Since Monex did not violate either Congressional intent or the Commission's rules,

the interest charges can not be a cause in fact of Purdy's damages.


Bucketing

 Purdy alleges that Monex operated as a bucket shop. The Supreme Court in 1906 defined

a bucket shop as:


> an establishment, nominally for the transaction of a stock exchange business, or business of
> similar character, but really for the registration of bets, or wagers, usually for small amounts,
> on the rise or fall of the prices of stocks, grain, oil, etc., there being no transfer or delivery of
> the stock or commodities nominally dealt in.

*Gatewood v. North Carolina,* 203 U.S. 531, 536, 27 S.Ct. 167, 168, 51 L.Ed. 305, 307 (1906).


A more recent decision involving the Chicago Board of Trade defined a "bucket shop" as "a

place where bets [are] placed on the commodity prices. The bets are not executed as contracts on

any legitimate exchange, but rather, a bet is placed on the bucket shop's books." *U.S. v. Sanders,* 696

F.Supp. 327, 330 (N.D.Ill.1988).


In 1936, Senator Pope recited what is now the generally accepted definition of bucketing in

futures trading:


> [The] method of doing business wherein orders of customers for the purchase or sale
> of commodities for future delivery, instead of being executed by bonafide purchases and sales
> with other traders, are simply matched and offset in the soliciting firm's own office and the
> firm itself takes the opposite side of customers' orders.

80 Cong.Rec. 8,088 (May 27, 1936) (remarks of Senator Pope). Leverage contracts, as intended by Congress when passing the Futures Trading Act of 1978, specify the LTM to be a principal to the customer's contract. *See supra* note 5. Furthermore, the LTM is the market maker, and, as principal, has no requirement to execute customer orders with other traders on any exchange.

Purdy knew that Monex operated that way, or at least he should have. The Commodity Account Agreements and Offering Statements outlined the characteristics of his leverage contracts with Monex. His long prior dealings with Monex, and the clear wording of the account documents he signed, are evidence that the terms of the margin contracts should have been clear to him.[24]

Finally, bucketing is not listed as a prohibited conduct for an LTM. Bucketing is expressly forbidden in commodity transactions, 17 C.F.R. § 30.02(d) (1986), but not in leverage transactions. 17 C.F.R. § 31.3 (1986). We hold the above evidence as substantial enough to support the ALJ's findings that bucketing violations did not exist, and therefore could not be a cause in fact of Purdy's losses.

Fraud

Purdy contends that Monex engaged in several fraudulent practices. He alleges Monex failed to disclose material facts regarding the risk associated with leverage contracts and Trade Eagles.[25] Purdy also alleges a failure to disclose Monex' existing litigation, and lapses in both Monex's and Albrecht's registration status. Finally, Purdy claims Monex breached a fiduciary duty by failing to disclose the above facts.

---

[24]The Monex Offering Statement sent to all customers states in relevant part: "Monex acts as a principal and as such sells to and buys from customers and dealers on its own behalf. It does not have members, perform a clearing house function, or serve as an auction marketplace.... [P]rices ... are established by Monex...."

[25]The Trade Eagle is a trading coin of solid gold or silver minted exclusively by Monex for sale to it's customers. Customers who pay full price for Trade Eagles may sell them to a third party.

Monex maintains it made all the appropriate disclosures in the Offering Statements required by law current at the time. Disclosure literature accompanying the initiation of an account satisfies a firm's disclosure obligations unless conduct which discounts or minimizes the importance of the disclosures, *Reed v. Sage Group, Inc.,* [1987–1990 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,943 at 34,299 (CFTC Oct. 14, 1987); *Clayton Brokerage Co. v. CFTC,* 794 F.2d 573, 580 (11th Cir.1986), or any factual misrepresentations exist.

Purdy testified that he only looked at the first page of the disclosure statements. This admission precludes an easy road ahead for Purdy to show any misrepresentation or nondisclosure to be the cause in fact of Purdy's losses. Nevertheless, we will review the evidence for substantiality.

### a. Enterprise Risk

Purdy had been speculating in precious metals since 1972, had read at least two treatises on investing by a recognized financial author, and read related periodicals at least once a week. Despite Purdy's testimony to the contrary at the hearing, the ALJ, based on Purdy's 650+ page deposition (and earlier pleadings), found him to be well versed in the nuances of margin and leverage contracts: the risk involved, and the extent of his exposure to that risk.

Furthermore, the promotional literature for the Trade Eagles explains that "relatively small movements in price [of the gold or silver] will amplify the potential gain *or loss* on your investment." (emphasis added) The promotional literature also stipulates any purchase as subject to the Monex Offering Statement and Trade Eagle Disclosure Statement. These statements explicitly discuss risk.[26]

The substantial testimonial and written evidence in the record leads us to support the ALJ's

---

[26]The Offering Statements say, in **LARGE BOLD PRINT** under the heading "Margin Transactions": "In credit transactions it is possible to gain *or lose* more than one's initial investment." (emphasis added) The Trade Eagle Disclosure Statements states under "Terms of Purchase": "It is *possible to receive a margin call* for additional funds and *to lose* more than one's initial investment." (emphasis added)

and Commission's conclusion that Monex adequately represented and disclosed the risks involved with leverage contracts.

### b. Existing Litigation

Purdy insists knowledge of pending litigation between Monex and the CFTC, and of a 1983 initial decision against Monex,[27] would have forewarned him about investing with Monex. This reasoning fails on several grounds. First, the CFTC has held that an initial decision pending Commission review is not a "judgment" which must be disclosed since issues of law remain unsettled. *In re Luizzi,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,833 (CFTC Jan. 27, 1981). Secondly, the rules relating to reparation proceedings are clear that an initial decision pending review is not a final order of the Commission,[28] and thus are unenforceable.

Although a ruling without the force of law may be material to a reasonable investor, the record reveals Purdy received the May 1984 Offering Statement, disclosing the 1983 initial decision against Monex. Purdy received it in a timely manner, yet continued to invest. The ALJ therefore ruled the action pending review by the CFTC against Monex could not have been material to Purdy.

Thirdly, a previous ruling by the Commission held Monex has no duty to disclose CFTC complaints against it. *Davis v. Monex Int'l, Ltd.,* [1988 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 24,279, at 35,225 (CFTC Jul. 7, 1988). Such disclosure is required only when the customer has given discretionary authority to Monex. The record clearly indicates Purdy gave no such authority to Monex.

---

[27]This initial decision was pending Commission review, and was subsequently reversed. *See In re First Nat'l Monetary Corp.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,707 (Apr. 29, 1983) *reversed and dismissed* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. ¶ 22,698 (CFTC Aug. 7, 1985).

[28]"The initial decision shall not become the final decision as to a party who shall have timely filed and perfected an appeal thereof to the Commission...." 17 C.F.R. § 12.314(d)(1).

## c. Late Registration

Registration of Monex and its account representatives became mandatory under the 1984 amendment to the CEA. 7 U.S.C.A. § 23 (West Supp 1992).[29] Once the CFTC began enforcement action against Monex for failure to apply for registration, Monex paid a fine to settle the action, and filed registration papers in accordance with the settlement order.[30] Monex disclosed the registration action to customers in its December 1984 Offering Statement, which Purdy testified he received. Disclosure of failure to register is only material if Monex was trying to solicit business from Purdy. *Hall v. Paine Webber Jackson & Curtis, Inc.* [1986–1987 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 23,317, at 32,889 (CFTC Oct. 8, 1986). However, Monex was not soliciting Purdy's business when the registration rules became enforceable. Nor did Monex fail to register; it failed to *apply* for registration. Purdy had dealt with Monex for twelve years prior to any registration requirement. He suffered the bulk of his losses in 1983, before the CFTC required registration. The ample evidence supports the ALJ's conclusion Monex' tardy registration application could not be construed as a cause in fact of Purdy's losses.

Albrecht's late registration filing could not be a cause in fact either. Purdy testified that he only relied on Albrecht's suggestions once, during the rumored Brazil default. That occurred after the December 1984 disclosure.

## d. Fiduciary Duty

Purdy contends, and Monex admits, that a fiduciary relationship existed between them. However, Purdy avers Monex violated its duty by not disclosing material facts regarding interest charged, margin risks, and existing litigation. As we have stated above, these were adequately disclosed (if only Purdy had read them), and therefore no violation of fiduciary duty exists in this case.

---

[29]The CFTC subsequently amended their rules to reflect the requirement, and outlined procedures therein. *See* 17 C.F.R. § 31.5.

[30]*See In re Monex Int'l, Ltd.,* [1984–1986 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 22,413 (CFTC Nov. 8, 1984).

In sum, the record reveals Purdy felt the tardy registration applications were "no big deal." In fact, he testified he would invest with the Hunt brothers, even if he knew they were under investigation by the Government. His previous pleadings and testimony indicate his understanding of margin contracts and their risk. Furthermore, he signed the Offering Statements, which disclosed what was required by law, without reading them. We find substantial evidence to support the ALJ's and Commission's findings that no fraud existed and therefore could not have been the cause in fact of his losses.

## Conclusion

While we sympathize with Mr. Purdy's extensive losses so late in his life, the evidence here compels us to agree with the Commission's acceptance of the ALJ's actions and findings. To do otherwise might encourage other market bulls to seek refuge in the courts for judicial licking of their wounds after suffering at the claws of a bear market. We therefore hold the order of the CFTC was correct. AFFIRMED.