**FIRST NATIONAL MONETARY CORPORATION and Michael Bivins, Petitioners,**

v.

**A.J. WEINBERGER and Commodity Futures Trading Commission, Respondents.**

**No. 86–3008.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 19, 1987.

Decided June 4, 1987.

Peter B. Kupelian, Southfield, Mich., Donald F. Tucker (argued), Stephen P. Ormond, Matthew W. Schlegel, for petitioners.

John R. Trentacosta, Detroit, Mich., Robert A. Hudson (argued), Jeffry M. Bauer, Charles D. Stodghill (argued), Gen. Counsel's Office, Commodity Futures Trading

Com'n, Washington, D.C., Whitney Adams, for respondents.

Before ENGEL and BOGGS, Circuit Judges, and CONTIE, Senior Circuit Judge.

BOGGS, Circuit Judge.

The First National Monetary Corporation and one of its account executives, Michael Bivins, (both parties hereinafter designated "FNMC"), petition for review of an order of the Commodity Futures Trading Commission ("CFTC") requiring them to make a reparation payment of $186,720.45 plus interest to A.J. Weinberger, a former client. The order affirmed the Administrative Law Judge's finding that FNMC had violated § 4o of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, and 17 C.F.R. § 31.03 [1] by fraudulently inducing Weinberger to buy and sell leverage contracts through misrepresentation and failure to disclose material facts.

FNMC argues that the ALJ was biased, and that his credibility determinations were not supported by the weight of the evi-

dence. It also argues that it was denied due process by being held liable under § 4o when the complaint had alleged only violations of § 4b. Finally, FNMC argues that Weinberger had not proven the necessary elements of fraud under § 4o, most importantly the scienter requirement. After careful consideration, we conclude that the scienter element in § 4o requires only proof of an intentional act and not proof of an intent to defraud. We find that the CFTC decided the issues correctly, and accordingly, affirm the award to Weinberger.

**I**

FNMC is registered with the CFTC as a Commodity Trading Advisor, trading in leverage contracts in precious metals. Weinberger filed a reparation complaint against FNMC and one of its account executives, Michael Bivins, pursuant to § 14 of the CEA, 7 U.S.C. § 18 (1978) (revised version at 7 U.S.C. § 18 (1983)) [2], on July 15, 1982. The complaint charged that Bivins fraudulently induced Weinberger to open an account with FNMC for the purpose of

---

1. Section 4o of the CEA, 7 U.S.C. § 6o, applies to fraud and misrepresentation by commodity trading advisors and commodity pool operators. 17 C.F.R. § 31.03 (1982) applies specifically to fraud in connection with trading leverage contracts in precious metals and other commodities. It provides:

> It shall be unlawful for any person, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:
>> (a) To employ any device, scheme, or artifice to defraud,
>> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or
>> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in, or in connection with (1) an offer to make or the making of, any transaction for the purchase, sale or delivery of silver bullion, gold bullion, bulk silver coins, bulk gold coins, or any other commodity pursuant to a standardized contract commonly known to the trade as a margin account, margin contract, leverage account, or leverage contract, or pursuant to any contract, account, arrangement, scheme, or device that serves the same function or functions as such a standardized contract, or is marketed or managed in substantially the

same manner as such a standardized contract, or (2) the maintenance or carrying of any such contract.

This regulation is now codified at 17 C.F.R. § 31.3 (1986).

2. Section 14(a) provided in pertinent part:

> Any person complaining of any violation of any provision of this chapter or any rule, regulation, or order thereunder by any person who is registered or required to be registered under ... this title may ... apply to the Commission by petition, which shall briefly state the facts, whereupon, if, in the opinion of the Commission, the facts therein contained warrant such action, a copy of the complaint thus made shall be forwarded ... to the respondent, who shall be called upon to satisfy the complaint, or to answer it in writing....

Subsection (e) provided that:

> If after a hearing on a complaint ... the Commission determines that the respondent has violated any provision of this chapter, or any rule, regulation, or order thereunder, the Commission shall, unless the offender has already made reparation to the person complaining, determine the amount of damage, if any, to which such person is entitled as a result of such violation and shall make an order directing the offender to pay to such person complaining such amount....

trading futures contracts in silver. Weinberger alleged that Bivins made material misrepresentations to him regarding trading in futures, and failed to disclose material facts including the risk involved in silver trading, that he relied on those statements in opening an investment account with FNMC, and consequently lost approximately $190,000. The complaint alleged that these actions constituted fraud under § 4b of the CEA, 7 U.S.C. § 6b.

The ALJ granted Weinberger's motion for summary judgment pursuant to 17 C.F.R. § 12.67 (1982) (current version at 17 C.F.R. § 12.310 (1986)) on September 2, 1983. The ALJ held FNMC liable on the basis of an ALJ's initial decision in an earlier enforcement proceeding, *In the Matter of First National Monetary Corp.*, [1982–1984 Transfer Binder] Comm.Fut.L. Rep. (CCH) ¶ 21,707 (April 29, 1983), holding that the leverage contracts traded by FNMC were actually off-exchange futures contracts which violated § 4h of the CEA, 7 U.S.C. § 6h. The summary judgment decided the issue of liability only, and a hearing was held before the ALJ on June 25, 1984, to determine damages. The misrepresentation claim was fully tried at this hearing.

The ALJ's opinion held FNMC liable on two independent grounds: 1) violating § 4h by trading in off-exchange futures contracts; and 2) violating § 4o by fraudulently inducing Weinberger to trade in leverage contracts. FNMC appealed to the CFTC. In the interim, the CFTC had reversed the earlier ALJ's Initial Decision holding that FNMC's leverage contracts violated § 4h, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,698 (CFTC August 7, 1985). The CFTC thus modified the ALJ's decision, affirming the § 4o violation, but reversing the § 4h violation.

## II

█ FNMC argues that the ALJ's decision to base liability on § 4h, although it was not pleaded in the complaint, and his reliance on another ALJ's non-binding initial decision, are evidence of his personal bias against it. It argues that it was error

for the ALJ not to recuse himself. FNMC's claim of personal bias is without merit. To be disqualifying, the alleged bias "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966). *See also In re M. Ibrahim Khan*, 751 F.2d 162, 164 (6th Cir.1984). Reliance on a non-binding decision is not an extrajudicial source. The bias must be personal, not judicial. It must arise " 'out of the judge's background and association' and not from the 'judge's view of the law.' " *United States v. Story*, 716 F.2d 1088, 1090 (6th Cir.1983) (quoting *Oliver v. Michigan State Board of Education*, 508 F.2d 178, 180 (6th Cir.1974), *cert. denied* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975)). FNMC's allegations cannot support a claim of personal, as opposed to judicial, bias.

## III

At the hearing before the ALJ, Weinberger and Bivins gave conflicting accounts of the transactions between them. Weinberger testified that he owned a travel agency and had no previous experience in trading futures contracts, commodities or precious metals, although he had invested in secure common stocks, some options, and Ginnie Mae bonds with Merrill Lynch. He testified that he had been contacted by an account executive for FNMC, a Mr. Siddiqui, in December 1981, about investing in precious metals. The account was then transferred to Bivins, who called him four or five times a day for several weeks.

Weinberger testified that Bivins told him that he was in charge of the FNMC Dallas office, that all sales people reported to him, and that he chaired national morning meetings on closed circuit TV. Bivins claimed to have the "eyes and ears and brainpickings of the big boys on the floor of the Commodities Exchange" and asserted that in nine years of experience none of his clients had lost money. He told Weinberger that his maximum loss would be

$15,000 to $25,000 and that he would monitor the account as if it were his own.

Weinberger testified that after approximately one and a half months of constant telephoning he agreed to invest because of Bivins's expertise and representations. He initially invested $70,000, hoping to make enough to establish accounts for his grandchildren. He testified that because of the nature of his job and his lack of expertise, he could not manage his account, and he relied on Bivins to do so. He testified that Bivins was aware of his lack of expertise. He also claimed that he would not have invested had he known that the risk was greater than Bivins had told him.

Weinberger read the Customer Trade Agreement but testified that he did not understand it. Bivins downplayed its importance and told him it was not necessary to have a lawyer review it. Weinberger believed the trading took place on an established market similar to the New York Stock Exchange and did not know he was buying from and selling to FNMC on all trades or that there was a mark-up and a commission charged on all trades. Weinberger approved all trades, but testified that he deferred to Bivins's suggestions.

When Weinberger's initial silver positions began to lose money, Bivins suggested that he take "straddle" positions to prevent future losses. Weinberger received account status statements four to five weeks after each trade and testified that he could not tell from the statements whether he had made or lost money or what the extent of the loss was. Bivins constantly told him that he was experiencing only "paper losses" and recommended that he invest more to mitigate the effect of the early losses. In March 1982, Weinberger realized he was losing money, and asked Bivins to get him out of the market, but Bivins assured him that the market was going up and that he should stay in. He did not get out of the market until May 1982, having lost almost $190,000.

Weinberger also testified that he was not a doctor, but could not explain why his customer account form listed his occupation as a doctor or how the confusion arose.

He further testified that his income was $30,000, although the customer account form showed income as $65,000. The form also listed his net worth as $750,000, although his investments did not total that much.

Bivins denied making most of the above statements to Weinberger. He testified that he began working for FNMC in March 1980, and therefore had only a couple of years of experience when his contact with Weinberger began. He testified that FNMC had a strict policy against "cold calling" and that he did not initiate the contact with Weinberger. He claimed that Weinberger had called him on advice from his son and expressed interest in the silver market. He sent information in a standard packet to Weinberger and advised him of the risks of commodities trading as well as the nature of FNMC's commission structure. He testified that Weinberger told him that he understood leveraging.

The ALJ issued his initial decision on December 7, 1984. He found that Weinberger had not met his burden of proving that he was contacted by an unsolicited phone call, although he noted that his testimony was not intended to be untruthful. The ALJ found that Weinberger was "not as naive as he would make himself to be nor as calculating as respondents seek to show." He concluded that the inconsistencies in Weinberger's testimony did not "demonstrate an intent to deceive or affect materially complainant's credibility." He then credited Weinberger's version of the statements made by Bivins, and found that Weinberger believed the misrepresentations and relied on them in deciding to invest.

■ FNMC argues that the ALJ's credibility determination cannot stand because of the inconsistencies in Weinberger's testimony. The scope of judicial review of the CFTC is wider than for some other agency action. "[F]indings of the Commission as to the facts, if supported by the weight of the evidence, shall ... be conclusive." 7 U.S.C. § 9. Courts have defined this standard as the "preponderance of the evidence." *Lawrence v. CFTC,* 759 F.2d 767,

773 (9th Cir.1985); *Haltmier v. CFTC,* 554 F.2d 556, 560 (2d Cir.1977). In applying this standard,

> the court's function is something other than that of mechanically reweighing the evidence to ascertain in which direction it preponderates; it is rather to review the record with the purpose of determining whether the finder of fact was justified, *i.e.,* acted reasonably....

*Haltmier,* 554 F.2d at 560.

Credibility determinations, however, are generally not to be set aside unless found to be inherently incredible or patently unreasonable. Appellate courts defer to the finder of fact, because the factfinder has the opportunity to observe the witnesses' demeanors. *See, e.g., NLRB v. Magnetics International, Inc.,* 699 F.2d 806, 813 (6th Cir.1983). However, "[a] reviewing court does not act, even in credibility matters, as a mere rubber stamp for the administrative action on appeal." *Krispy Kreme Doughnut Corp. v. NLRB,* 732 F.2d 1288, 1290 (6th Cir.1984). A reviewing court must consider evidence which fairly detracts from the weight of the credibility determination, and in a case where one witness's testimony is flatly contradicted by several others, the court must carefully examine the credibility finding. *Id.* at 1290.

The case before us does not rise to the level of *Krispy Kreme,* where one witness's story was contradicted by several others. Here, Bivins and Weinberger contradicted each other, and the ALJ had to decide whose testimony to believe. The ALJ carefully analyzed the alleged "taints" on Weinberger's credibility and determined that his version was more believable than Bivins's. In this situation, we defer to the factfinder's determination of credibility.

## IV

■ We now turn to the question of liability under § 4o of the CEA. FNMC argues that it was denied due process when the ALJ premised liability under § 4o and 17 C.F.R. § 31.03, when Weinberger's complaint pleaded only a violation of § 4b. It contends that it was denied notice of the charges against it and that the ALJ im-

properly amended Weinberger's complaint. Although counsel for FNMC asserted at oral argument that it had raised this due process argument before the CFTC, there is no evidence in the record that the issue was brought to the CFTC's attention. In the interests of judicial economy, an appellate court will generally not review issues that were not addressed to the forum below. *E.g., Sigmon Fuel Co. v. TVA,* 754 F.2d 162, 164–65 (6th Cir.1985).

■ Even if the issue had been properly raised before the CFTC, the ALJ's consideration of § 4o was appropriate and FNMC suffered no prejudice thereby. Proceedings before the CFTC are subject to liberal pleading rules. The statute specifies only that a reparation complaint "briefly state the facts" surrounding a violation of a rule, regulation, or statutory provision. 7 U.S.C. § 18(a). CFTC regulations provide that the complaint shall contain the facts constituting a violation and *"[i]f possible,* the specific provisions of the Act, rule, regulation or order claimed to have been violated...." 17 C.F.R. § 12.21(a)(3) (1982) (emphasis supplied) (current version at 17 C.F.R. § 12.13(b)(1)(iii) (1986)). The CFTC has held that "[c]onsistent with notice pleading concepts, it is sufficient for the customer to set forth the course of conduct upon which his claim is based, leaving it for the Commission to affix liability upon specific provisions of law which the record disclosed have been violated." *Hunter v. Madda Trading Co.,* [1980–1982 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,242 at 25,205 n. 12 (CFTC Sep. 2, 1981).

Furthermore, the regulations specifically allow the ALJ to consider matters not raised in the pleadings. 17 C.F.R. § 12.45(d) (1982) (current version at 17 C.F.R. § 12.307(c) (1986)) states that:

> When issues not raised by the pleadings but reasonably within the scope of a reparation proceeding initiated by the complaint are tried with the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.

The issue of fraud under § 4o was reasonably within the scope of the reparation

proceeding. Weinberger's complaint gave FNMC sufficient notice that it was being charged with fraud in connection with his leverage account. FNMC did not argue before the ALJ that § 4b did not apply to its activities but stated that it was prepared to defend against the fraud claim. Thus, the fraud claim was fully tried at the hearing with the implied consent of both parties. It was proper for the ALJ to base liability on § 4o which applied to fraud by commodity trading advisors such as FNMC.

This liberal pleading procedure did not amount to a denial of due process in this case. Weinberger's complaint fully notified FNMC as to which transactions were complained of, as well as the allegedly improper nature of the conduct. The complaint clearly alleged fraud or misrepresentation. FNMC was not unfairly surprised and had full opportunity to defend itself at trial against the fraud charge. The only prejudice FNMC can show is that it was not able to rely on the defense it had hoped to use, the argument that § 4b did not apply to their activities because it applied only to fraud in connection with orders placed on a contract market and they did not trade on any market recognized by the CFTC. Denial of this defense is simply not a denial of due process. Mistakes made by parties in pleading the wrong regulation are precisely the sort of mistake that the liberal pleading policy is intended to address and the very reason that the CFTC has the power to impose liability under regulations not pleaded by the parties if the facts pleaded support a violation of that regulation.

## V

■ FNMC next claims that Weinberger had not proven the necessary elements of a fraud claim under § 4o. Section 4o of the CEA, 7 U.S.C. § 6o (1) provides:

(1) It shall be unlawful for any commodity trading advisor or commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

The requirements for a fraud claim under § 4o are basically the same as for a fraud claim under § 4b. The elements are derived from the common law action for fraud. Weinberger has to prove that FNMC misrepresented a material fact which was intended to induce reliance, that he reasonably relied on the misrepresentation, and that the reliance was the proximate cause of his damages. *See Horn v. Ray E. Friedman & Co.*, 776 F.2d 777, 780 (8th Cir.1985); *accord Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d Cir.1986).

■ The CFTC's finding that Bivins's statements regarding his expertise, status and ability to "control" the market, as well as his statements as to the structure of the market and the nature of the risk were material is supported by the weight of the evidence and in keeping with the applicable law. "[A] statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Saxe*, 789 F.2d at 111. The Second Circuit in *Saxe* disagreed with the district court's holding that statements regarding the likelihood of profits from futures trading were mere "puffing." The court was of the opinion that such statements could be viewed as further misrepresentations of limited risk and thus could be actionable under the CEA. Misrepresentations as to a salesperson's knowledge and experience can also be actionable. *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1044 (2d Cir.1983).

FNMC next argues that Weinberger's damages were not proximately caused by the misrepresentations because he knew of the risk in March 1982 and chose to stay in the market until May attempting to salvage his position. FNMC states this argument in two ways, arguing first that Weinberger

did not mitigate his damages by getting out of the market in March, and also that Weinberger should be estopped from complaining of his losses because he ratified each trade that Bivins made. The CFTC correctly found these arguments without merit.

The CFTC found that Weinberger was not aware of the extent of his losses because he could not understand the profit and loss statements sent out by FNMC. It found that Weinberger's decision to stay in the market past March was caused by Bivins's "lulling conduct"—his continued assurances that Weinberger was suffering only "paper losses" and his predictions that the market was about to turn around. The CFTC's determination that Bivins's misrepresentations were the proximate cause of Weinberger's losses is supported by the preponderance of the record evidence and must be upheld.

### VI

█ FNMC's final argument is that Weinberger did not prove that the misrepresentations were knowing and willful. It argues that § 4o contains a scienter element that requires proof of an intention to defraud. There is a specific scienter requirement in the language of § 4b in that the misrepresentation must be made "willfully" or "knowingly".[3] *See CFTC v. Savage,* 611 F.2d 270, 283 (9th Cir.1979). Section 4o does not contain the same "knowing" or "willful" language.

Of course, the mere absence of the words "knowing" or "willful" will not always lead to the conclusion that a given section does not include a scienter requirement. The Supreme Court in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), held that there was a scienter requirement in § 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated by the SEC under § 10(b). Section 10(b) makes it unlawful

(b) [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. The Court held that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct." *Id.* at 197, 96 S.Ct. at 1383. The Court further held that Rule 10b-5, promulgated under the authority of § 10(b), could not go beyond the authority of the statute and prohibit negligent conduct, despite language similar to our statute which could be read to support liability upon a showing of negligence only.

In this case, however, we are interpreting the language of the statute itself, rather than the language of a regulation limited by the language of the enabling statute. We need concern ourselves only with the plain language of the statute. The lan-

---

**3.** Section 4b, 7 U.S.C. § 6b, provides in pertinent part:
It shall be unlawful (1) for any member of a contract market ... in connection with ... any contract of sale of any commodity in interstate commerce ... subject to the rules of any contract market ...
(A) to cheat or defraud or attempt to cheat or defraud such other person;
(B) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
(C) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract ... or

(D) to bucket such order, or to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person, or become the seller in respect to any buying order of such person.
The scienter requirement of § 4b does not require proof of evil motive, or subjective intent to defraud. Proof that the salesperson acted deliberately, knowing that his acts were unauthorized and contrary to the customer's instructions, has been held to be enough to establish willful conduct within the meaning of § 4b. *See CFTC v. Morse,* 762 F.2d 60, 62 (8th Cir. 1985); *Haltmier v. CFTC,* 554 F.2d 556, 562 (2d Cir.1977).

guage used by Congress in § 4o does not compel the same scienter requirement as § 4b. Section 4o(1)(A) prohibits commodity trading advisors from "employ[ing] any device, scheme, or artifice to defraud any client ...," which may imply a scienter requirement by using the term "defraud." However, § 4o(1)(B) does not require intent, as it prohibits "engag[ing] in any transaction ... which operates as a fraud or deceit...." 7 U.S.C. § 6o. This language focuses on the effect of the conduct upon the clients, not on the intent of the advisor.

Language similar to § 4o(1)(B) has been held by the Supreme Court not to imply a scienter requirement. In *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980), the Court held that the SEC need not prove scienter to enjoin violations of § 17(a)(3) of the Securities Act of 1933, 15 U.S.C. § 77q(a)(3). That section made it unlawful for any person "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit." Equivalent language was at issue in *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). The Court held that intent to defraud was not required to enjoin violations of § 206(2) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–6, which prohibits any act or practice of an investment adviser that "operates as a fraud or deceit upon any client."

In *CFTC v. Savage,* 611 F.2d at 285, the Ninth Circuit relied upon *Aaron and Capital Gains* in holding that proof of intent to defraud was not necessary for the CFTC to enjoin violations of § 4o of the CEA. The court found that it was in keeping with the purposes of the CEA to require a showing of scienter under § 4b, which applies to any person trading on a futures market, but not to require proof of intent under § 4o, which applies only to commodity trading advisors acting in their fiduciary capacity in advising clients. We agree with the Ninth Circuit that Congress intended to hold fiduciaries to a higher standard of care under the CEA.

We therefore conclude that § 4o does not contain the same scienter requirement as § 4b. To succeed in a reparation proceeding before the CFTC under § 4o, the complainant need prove only that the commodity trading advisor intentionally made the statements complained of, and not that the advisor acted with the intent to defraud.

The CFTC's finding that Weinberger had proven the necessary intent under § 4o is supported by the weight of the evidence and will be upheld. We conclude that the CFTC's determination that Weinberger had shown all the necessary elements to support his claim of misrepresentation is supported by the weight of the evidence on the record and in keeping with applicable law. Accordingly, the order of the CFTC is AFFIRMED.