Robert McANALLY; Delbert
Whorton, Appellants,

v.

John GILDERSLEEVE, Appellee.

No. 92–3825.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 16, 1993.

Decided Feb. 25, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied April 7, 1994.

Counsel who presented argument on behalf of the appellants was James S. Dunham of Russellville, AR.

Counsel who presented argument on behalf of the appellee was Elizabeth J. Robben of Little Rock, AR.

Before MAGILL, Circuit Judge, LAY, Senior Circuit Judge, and HANSEN, Circuit Judge.

MAGILL, Circuit Judge.

This case involves a determination of whether a jury could have reasonably concluded, based on the evidence presented, that John Gildersleeve (Gildersleeve) defrauded plaintiffs based on Arkansas common law fraud and violations of the Commodity Exchange Act (CEA), 7 U.S.C. § 6b (1988). Robert McAnally and Delbert Whorton (collectively, the plaintiffs) appeal the district court's [1] grant of judgment as a matter of law and, in the alternative, the district court's judgment for a new trial. Because we hold that a jury could not have concluded reasonably that plaintiffs justifiably relied on Gildersleeve's alleged misrepresentations, we affirm the judgment of the district court.

## I. BACKGROUND

McAnally responded to a cut-out coupon advertisement for Multivest, a corporation that provided brokerage services. Soon after responding, Gildersleeve, an account ex-

1. The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

ecutive for Multivest, called McAnally as a follow-up to the information requested. Gildersleeve introduced McAnally, and then later Whorton, to the risky world of commodity futures options.

A commodity futures option is a right to buy a certain quantity of a commodity, such as soybeans or corn, at a specified price, at a specified time in the future. The cost of purchasing this right is the option price. The buyer of a commodity option "bets" that the value of his right to buy a specified quantity of a commodity, at a specified price, at a specified time, will become more valuable over time. By way of example, on June 1, 1987, a hypothetical investor purchases an option to buy (known as a "call option") two "contracts" (each contract represents 5000 bushels) of corn at $3.20 per bushel (the "strike price") on December 1, 1987 (the expiration date). The hypothetical investor pays $0.12 per bushel, plus any commission charged by the brokerage firm, for this right.[2] The investor has purchased the right, but not the obligation, to buy 10,000 bushels of corn at $3.20 per bushel on December 1, 1987. In effect, the investor is betting that the market price of corn and the value of his option will rise between the time he buys the option and the time at which the option expires.

If the value of the option rises more than the cost of the brokerage firm's commission, the investor will sustain a profit if he trades or exercises the option. If, however, the value of the option decreases, the investor will lose money. One attractive aspect of commodity futures options is that the investor's potential loss is limited to the price of the option plus the commission. Although commodity futures options may result in the loss of an investor's entire investment, they attract investors because they can result in substantial profits in a short period of time. For example, both McAnally and Whorton

earned 75% profit on an investment in heating oil options that they held for only six days.

McAnally bought commodity futures options through Gildersleeve from June 15, 1988 through November 21, 1988. Whorton bought commodity futures options through Gildersleeve from June 24, 1988 through August 12, 1988. Specifically, plaintiffs bought corn options relying on Gildersleeve's statements that there was a severe drought affecting the corn farmers in the Midwest. Public reports of drought conditions and crop predictions corroborated Gildersleeve's statements. Plaintiffs' expert also indicated that Gildersleeve's prediction that corn prices would rise in the summer of 1988 was "one of those once-a-decade consensus trades" where 95% of the people believed that the price of corn would rise. The value of their corn options, however, did not rise as predicted. In fact, all of the corn options became worthless, resulting in a $22,496 loss to McAnally and a $12,500 loss to Whorton.

McAnally and Whorton also traded commodity options with A.G. Edwards & Sons, Inc. (A.G. Edwards), another brokerage firm that charged a lower commission than Multivest. Plaintiffs admitted during trial that they were aware of the risks involved in commodity futures options trading when they began trading with A.G. Edwards on July 21, 1988. At A.G. Edwards, McAnally traded corn, beans, silver, and heating oil options. McAnally also traded cattle, corn, and treasury bond futures, which, unlike options, have a potential for loss greater than the initial investment. Whorton's investments at A.G. Edwards, prior to his trading with Gildersleeve, included stock in Wal–Mart and Tyson that had appreciated dramatically.

McAnally and Whorton sued Gildersleeve under Arkansas common law fraud and for violation of § 4b of the CEA (codified at 7 U.S.C. § 6b).[3] At the close of plaintiffs' evi-

---

2. In this example, the cost of the option would be $0.12 per bushel times 10,000 bushels or $1200, plus commission. Multivest charged 25% commission. In this case Multivest, i.e., Gildersleeve's employer, would have received $300 commission. Gildersleeve, in turn, would receive a percentage of that commission.

3. At the outset, we should note that this is not a case involving claims of breach of fiduciary duty or negligence, nor is it a case involving a broker who had discretionary control over the customers' accounts. This case is about allegations of fraudulent misrepresentations, deliberately made by Gildersleeve, with the intent to deceive McAnally and Whorton.

dence, the district court denied Gildersleeve's motion for a directed verdict. After Gildersleeve presented his defense, the jury returned a verdict in favor of plaintiffs for compensatory and punitive damages. The district court, however, granted Gildersleeve's motion for judgment as a matter of law. McAnally and Whorton timely appealed.

## II.  DISCUSSION

McAnally and Whorton argue that the trial court's grant of judgment as a matter of law was improper because there was sufficient evidence of fraud to support the jury's verdict. Because McAnally and Whorton pleaded fraud, they are limited to the specific allegations pleaded in their complaint. *See* Fed.R.Civ.P. 9(b); *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir.1985). Their complaint alleged, and the trial court noted, four separate bases for a finding of fraud: (1) Gildersleeve told plaintiffs that he had several other clients who had earned large profits through commodity futures options (Allegation One); (2) Gildersleeve guaranteed that plaintiffs were "virtually certain" to make a great deal of money (Allegation Two); (3) Gildersleeve stated that the risk disclosure statement given to plaintiffs was "a mere formality" and that it "greatly overemphasized" the risks involved (Allegation Three); and (4) Gildersleeve misrepresented the level of risk involved in this type of investment (Allegation Four). Appellants' Br. at 23. McAnally and Gildersleeve argue that they presented sufficient evidence for a reasonable jury to find fraud.

We must decide whether a jury could have reasonably concluded that Gildersleeve defrauded plaintiffs. We hold that a jury could not have reasonably concluded that plaintiffs relied on the alleged misrepresentations, *i.e.*, that a jury could not have reasonably concluded that Gildersleeve's misrepresentations were the proximate cause of plaintiffs' loss.

Therefore, we affirm the judgment of the district court.

### A.  Standard of Review

■ In reviewing a judgment as a matter of law, this court reviews the trial court's decision de novo and applies the same strict standard as the district court. *Morgan v. Arkansas Gazette*, 897 F.2d 945, 948 (8th Cir.1990) (citing *Cleverly v. Western Elec. Co.*, 594 F.2d 638, 641 (8th Cir.1979) (per curiam)). This standard requires the appellate court to

> "consider the evidence in the light most favorable to the [plaintiffs], assume that the jury resolved all conflicts of evidence in favor of [the plaintiffs], assume as true all facts which the [plaintiffs'] evidence tended to prove, give the [plaintiffs] the benefit of all favorable inferences which may reasonably be drawn from the facts, and [reverse the judgment as a matter of law], if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence."

*Minneapolis Community Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir.1991) (quoting *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 989 (8th Cir. 1989)). Therefore, this court must reverse the district court if reasonable jurors could have found that Gildersleeve defrauded the plaintiffs. *See Western Am., Inc. v. Aetna Casualty & Sur. Co.*, 915 F.2d 1181, 1183 (8th Cir.1990). Normally, this court only can consider evidence favoring the nonmoving party in reviewing a grant of a judgment as a matter of law. *Dace v. ACF Indus., Inc.*, 722 F.2d 374, 376 (8th Cir.1983). In *Dace*, however, the court left open instances in which a reviewing court can consider the moving party's evidence.[4] We interpret *Dace* to allow us to review the plaintiffs' uncontradicted cross-examination testimonies. *See id.* at 377 n. 6.[5]

---

4. The *Dace* court stated:
   > There may be particular situations in which the rule should not be rigidly applied. If, for example, the moving party's evidence is completely disinterested, uncontradicted, and unimpeached, or if the evidence of the nonmovant is contrary to established scientific fact,

some modification of the general rule may be called for.
722 F.2d at 377 n. 6.

5. Only an unreasonable juror could credit testimony given by a plaintiff on his own behalf during direct examination, and then disbelieve

### B. Elements of Fraud

■ Both parties correctly acknowledge that fraud under "section [4b] of the CEA is substantially the same" claim as Arkansas common law fraud. *Greenwood,* 776 F.2d at 789; Appellants' Br. at 24; Appellee's Br. at 22; *see also Horn v. Ray E. Friedman Co.,* 776 F.2d 777, 780 (8th Cir.1985). To recover under common law fraud, the plaintiff must prove "a false representation of a material fact with knowledge or belief on the part of the defendant that the representation is false. The false representation must be made with the intent to induce the other party to rely upon that representation." *Greenwood,* 776 F.2d at 789; *see also Storthz v. Commercial Nat'l Bank,* 276 Ark. 10, 631 S.W.2d 613, 616 (1982). Specifically, this circuit requires a finding of scienter, *i.e.,* the plaintiff must demonstrate that the defendant knew that the misrepresentation was false when made. *McIlroy v. Dittmer,* 732 F.2d 98, 101–02 (8th Cir.1984); *see Greenwood,* 776 F.2d at 789. The plaintiff also must demonstrate that any damage "resulted from his justifiable reliance on the defendant's misrepresentation." *Horn,* 776 F.2d at 780 (citing *Restatement (Second) of Torts* § 537 (1977)). Justifiable reliance requires that the plaintiffs actually relied on the misrepresentations, and that this reliance was reasonable.[6]

### C. Reasonable Jury Conclusion

We discuss the four allegations of fraud in two separate sections. The first section concerns Allegation One: Gildersleeve misrepresented that some of his clients earned large profits. The second section concerns Allegations Two, Three, and Four: Gildersleeve minimized the risks involved in commodity futures options. Because these three allegations each concern misrepresentations regarding the level of risk involved in commodity futures options trading, we treat them together as one type of misrepresentation.

### 1. Allegation One

■ McAnally and Whorton claim that Gildersleeve misrepresented to them that some of his clients had earned large profits trading commodity futures options. As a result of these misrepresentations, plaintiffs claim that Gildersleeve defrauded them and caused them to incur losses that they would not have otherwise sustained. We disagree.

■ In order to prove a claim of fraud, the plaintiff must demonstrate that defendant made a material false statement knowing that it was false at the time made. *Greenwood,* 776 F.2d at 789. In this case, Gildersleeve admitted telling plaintiffs about successful clients, but plaintiffs have provided no evidence that these statements were false. Although " 'a measure of speculation and conjecture' may be necessary for the jury to 'choos[e] what seems to be the most reasonable inference,' " *City of Omaha Employees Betterment Ass'n v. Omaha,* 883 F.2d 650, 651 (8th Cir.1989) (quoting *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946)), this court has granted judgments as a matter of law notwithstanding the verdict when the record " 'contain[ed] no proof, beyond speculation.' " *Id.* at 652. We hold that, as a matter of law, there was insufficient evidence for a reasonable jury to conclude that Gildersleeve knowingly misrepresented the success of his clients to plaintiffs.

### 2. Allegations Two, Three, and Four

■ McAnally and Whorton claim that Gildersleeve misrepresented the risk involved in commodity futures options trading. Specifically, plaintiffs claim that Gildersleeve overemphasized the potential and likelihood of profit, minimized the importance and challenged the accuracy of the risk disclosure statement, and minimized the level of risk involved in commodity futures options trad-

statements made by the same plaintiff when made against his interests on cross-examination. Therefore, we find it proper to consider McAnally and Whorton's cross-examination testimonies. *See Dace,* 722 F.2d at 377 n. 6.

**6.** The *Restatement (Second) of Torts,* relied upon by this court in *Horn,* 776 F.2d at 780, divides justifiable reliance into two subparts: (1) a determination that the plaintiff actually relied on the misrepresentation, and (2) a determination that the reliance is justifiable. *Restatement (Second) of Torts* § 537 (1977).

ing. Plaintiffs claim that the evidence supported the jury's finding that they had justifiably relied on these alleged misrepresentations, *i.e.*, the alleged misrepresentations were the proximate cause of their losses. We disagree.

Once again, plaintiffs had the burden of demonstrating that Gildersleeve made material false statements that he knew or believed to be false. *See Greenwood*, 776 F.2d at 789. In addition, plaintiffs had to demonstrate that Gildersleeve's false statements were made with the intent to induce McAnally and Whorton to rely on those representations, *see id.*, and that any damage "resulted from [their] justifiable reliance on the defendant's misrepresentation[s]." *Horn*, 776 F.2d at 780. We analyze each of these elements in turn.

### a. Material Misrepresentations Made with Requisite Scienter

There was sufficient evidence for a reasonable jury to conclude that Gildersleeve made material misrepresentations knowing that those statements were false. The level of risk involved in commodity futures options trading is material to a reasonable investor's decision to invest.[7] Plaintiffs testified that Gildersleeve minimized the risk involved in commodity futures options trading.[8] Plaintiffs also provided evidence that these statements were false because trading commodity futures options is not minimally risky.[9] McAnally and Whorton also had to demonstrate, however, that Gildersleeve knew or

believed that his statements were false at the time made. *See Horn*, 776 F.2d at 780 (holding that plaintiff must demonstrate that defendant made false statement with knowledge or belief that it was false). Plaintiffs satisfied this burden by eliciting testimony from Gildersleeve that he knew that commodity futures options trading was not minimally risky.[10] We hold that there was sufficient evidence for a reasonable jury to find that Gildersleeve knowingly made material misrepresentations regarding the level of risk involved in commodity futures options trading.

### b. Intent to Induce Reliance

There was sufficient evidence for a reasonable jury to find that Gildersleeve made these misrepresentations to induce plaintiffs to trade commodity futures options. Gildersleeve does not dispute that he received a portion of his employer's commission every time McAnally or Whorton bought a commodity futures option through him. Inferring that Gildersleeve stood to benefit when plaintiffs purchased the options, a reasonable jury had sufficient evidence to conclude that Gildersleeve made the false statements to the plaintiffs with the intent to induce them to buy commodity futures options. *See Western Am., Inc.*, 915 F.2d at 1183.

### c. Reliance by Plaintiffs

To recover under their fraud claims, plaintiffs had to demonstrate that Gildersleeve's misrepresentations were the proximate cause

---

7. "In the securities law context, a statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d Cir.1986) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Like the Second Circuit, we see no reason to deviate from this standard in the realm of commodity futures options trading. *See id.*

8. Both plaintiffs testified that Gildersleeve minimized the risk involved in commodity futures options trading. Tr. at 105–06 (testimony of McAnally: "the way he indicated to me ... there is always ... some risk ... but ... the risk is very minimal"); *id.* at 134 ("based on what he told me, the risk was minimal and that I could expect a ... return"); *id.* at 136 ("any risk is

very minimal, and that was my assumption based on what he told me"); *id.* at 194 (testimony of Whorton, "Q: What type of risk did you understand was involved in investing in commodities trading? A: Very little. Q: And how did you develop that understanding? A: [Gildersleeve] kept telling how much money I was going to make...."); *id.* at 244 ("Mr. Gildersleeve explained it was low risk or no risk.").

9. Tr. at 300–01 (testimony of plaintiffs' expert: "[I]f I had 100 people that bought call options ...[,] if 15 out of the 100 made any money at all, I would be surprised.").

10. Gildersleeve admitted that trading options involved "substantial risk," Tr. at 500, and that commodity futures options trading involved "a high degree of risk," *id.*

of their losses, *i.e.*, they justifiably relied on Gildersleeve's misrepresentations. *See Horn*, 776 F.2d at 780. Plaintiffs argue that the trial court improperly held that they did not rely on the misrepresentations of Gildersleeve. The trial court based its holding on three factors. First, both plaintiffs signed risk disclosure statements before they commenced trading through Gildersleeve.[11] Second, the trial court held that plaintiffs were not inexperienced investors.[12] Finally, the trial court found that plaintiffs traded options with A.G. Edwards & Sons, Inc., after they had become fully aware of the risks inherent in commodity trading. Although we hold that the first two factors relied upon by the trial court were not sufficient to support its judgment, we agree that reasonable persons could not differ as to the conclusion to be drawn from plaintiffs' continued trading with A.G. Edwards and Gildersleeve after plaintiffs were aware of the risks. Therefore, we hold that plaintiffs failed, as a matter of law, to demonstrate that they justifiably relied on Gildersleeve's misrepresentations. We analyze these three factors in turn.

▮▮▮▮ We disagree with the trial court as to its conclusion based on plaintiffs' acknowledgments indicating that they read and understood the risk disclosure statements. Normally, the fact that the plaintiffs signed and returned the risk disclosure statements satisfies the broker's duty to inform his clients of the risks involved. *See, e.g., Johnson v. Don Charles & Co.*, Comm.Fut.L.Rep. (CCH) ¶ 24,986, 1991 WL 83511, 1991 CFTC LEXIS 14, at *11 (Jan. 16), *aff'd sub nom. Johnson v. CFTC*, 948 F.2d 1297 (11th Cir. 1991). In addition, a plaintiff who signs the acknowledgment without reading the risk disclosure statement "precludes an easy road . . . to show[ing] any misrepresentation or nondisclosure to be the cause in fact" of that plaintiff's losses. *Purdy v. Commodity Futures Trading Comm'n*, 968 F.2d 510, 521 (5th Cir.1992), *cert. denied*, ― U.S. ―, 113 S.Ct. 1326, 122 L.Ed.2d 711 (1993). In *Clayton Brokerage Co. v. Commodity Futures Trading Comm'n*, however, the Eleventh Circuit held that "[o]ral misrepresentations may effectively nullify the warnings in a [risk disclosure statement] by discounting its general significance and its relevance to the customer's particular situation." 794 F.2d 573, 580 (11th Cir.1986); *see also Purdy*, 968 F.2d at 521 (stating that "[d]isclosure literature accompanying the initiation of an account satisfies a firm's disclosure obligations unless conduct which discounts or minimizes the importance of the disclosures . . . or any factual misrepresentations exist"). In this case there are specific allegations and testimony that Gildersleeve discounted the significance of the risk disclosure statement and questioned its accuracy.[13] We hold, in this

---

**11.** The trial court held that by signing the risk disclosure statements, the plaintiffs acknowledged that they had read and understood the risks that were fully and unambiguously disclosed in the Option Disclosure Statements and Customer Agreement. The Options Disclosure Statement provides in large capital letters:

BECAUSE OF THE VOLATILE NATURE OF THE COMMODITIES MARKETS, THE PURCHASE AND GRANTING OF COMMODITY OPTIONS INVOLVE A HIGH DEGREE OF RISK. COMMODITY OPTION TRANSACTIONS ARE NOT SUITABLE FOR MANY MEMBERS OF THE PUBLIC. SUCH TRANSACTIONS SHOULD BE ENTERED INTO ONLY BY PERSONS WHO HAVE READ AND UNDERSTOOD THIS DISCLOSURE STATEMENT AND WHO UNDERSTAND THE NATURE AND EXTENT OF THEIR RIGHTS AND OBLIGATIONS AND OF THE RISKS INVOLVED IN THE OPTION TRANSACTIONS COVERED BY THIS DISCLOSURE STATEMENT.
. . . .

A PERSON SHOULD NOT PURCHASE ANY COMMODITY OPTION UNLESS HE IS ABLE TO SUSTAIN A TOTAL LOSS OF THE PREMIUM AND TRANSACTION COSTS OF PURCHASING THE OPTION. A PERSON SHOULD NOT GRANT ANY COMMODITY OPTION UNLESS HE IS ABLE TO MEET ADDITIONAL CALLS FOR MARGIN WHEN THE MARKET MOVES AGAINST HIS POSITION AND, IN SUCH CIRCUMSTANCES, TO SUSTAIN A VERY LARGE FINANCIAL LOSS.
Appellee's App. at 1.

**12.** Specifically, plaintiffs each had three years' investment experience with stocks and bonds, and McAnally had an additional two years' investment experience in money market and mutual funds and ten years' investment experience in real estate.

**13.** Tr. at 130 (testimony of McAnally: "[The risk disclosure statements] w[ere] just basically a formality, is my understanding"); *id.* at 249 (testimony of Whorton: "[Gildersleeve] just skimmed through [the risk disclosure statement] and told

narrow instance where the alleged misrepresentations by the defendant discounted the importance and questioned the accuracy of the risk disclosure statements, that plaintiffs' signatures acknowledging that they read and understood the risk disclosure statements do not preclude a reasonable jury from concluding that plaintiffs justifiably relied on Gildersleeve's alleged misrepresentations.[14]

Similarly, we disagree with the district court's reliance on plaintiffs' investment experience. Although plaintiffs did have significant experience and success with stocks and bonds, plaintiffs' expert testified that McAnally and Whorton were "unsophisticated" with respect to commodity futures options, Tr. at 305, and that with respect to the "fickleness of option prices, I don't think they had a clue," *id.* We hold that there was sufficient evidence for a reasonable jury to have concluded that plaintiffs were not sophisticated with respect to commodity futures options.

Plaintiffs' continued trading of commodity futures options with A.G. Edwards and with Gildersleeve, transacted after they admittedly were aware of the risks involved, however, supports the trial court's judgment and is dispositive of this case. Plaintiffs claim that "but for" the statements by Gildersleeve that misrepresented the riskiness of commodity futures options, they would not have purchased any options.[15] Thus, plaintiffs claim that Gildersleeve's misrepresentations were the proximate cause of their losses.[16]

Although we accord substantial deference to the jury's verdict, we cannot accord the jury with "the benefit of unreasonable inferences, or those 'at war with the undisputed facts.'" *City of Omaha Employees Betterment Ass'n*, 883 F.2d at 651 (quoting *Marcoux v. Van Wyk*, 572 F.2d 651, 653 (8th Cir.1978) (internal quotation marks omitted)). This court's decision in *Greenwood v. Dittmer* is instructive on this point. In *Greenwood*, this court affirmed the district court's grant of a judgment notwithstanding the verdict because the evidence supported only one "plausible inference." 776 F.2d at 789. Greenwood alleged violations of the Commodities Exchange Act and Arkansas common law fraud because defendant advised him to accept short sales of cattle futures (implicitly advising that the price of cattle futures would *fall*) while defendant simultaneously was attempting to drive *up* the price of cattle futures. *Id.* The evidence indicated that the brokers who advised Greenwood personally took short positions in cattle futures when they were advising Greenwood to do likewise. *Id.* In light of this evidence, this court rejected the jury's conclusion because the only "plausible" inference from this evidence was that the brokers gave Greenwood the investment advice in good faith. *Id.*

Similarly, the only conclusion a reasonable jury could have reached, in light of the plaintiffs' post-July 21, 1988 trades with both A.G. Edwards and Gildersleeve, is that Gildersleeve's pre-July 21, 1988 misrepresentations

---

me I had to sign in certain places ... before I could make a trade").

**14.** Before a client may open a commodity futures account, he must receive a risk disclosure statement, sign an acknowledgement that he understands the risk disclosure material, and return the signed acknowledgement to the broker. 17 C.F.R. § 1.55 (1989). Although signing and returning the acknowledgement creates a presumption that the customer understands the risk involved, we decline to hold that it precludes a finding of fraud when the alleged misrepresentations minimize the importance and challenge the accuracy of the risk disclosure statement. Such a broad holding would send a signal to commodities brokers that they could flagrantly challenge the risk disclosure statements and misrepresent the risks involved with impunity.

**15.** *See* Tr. at 120 (testimony of McAnally: "Had I known the—true risk involved, I would not have even considered [investing with Gildersleeve]"); *id.* at 199 (testimony of Whorton: "Q: ... If you had understood the risks involved, would you have invested? A: No way").

**16.** Plaintiffs continued to make trades with Gildersleeve after July 21, 1988. Appellee's Br. at 9, 13 (listing the trades made by McAnally and Whorton with Gildersleeve). Plaintiffs made these trades even though they were aware fully of the risk and that Gildersleeve had misrepresented that risk. Further, McAnally testified that he later made trades with Gildersleeve after all his options had expired to zero. Tr. at 117 (testimony of McAnally: "[Gildersleeve] contacted me—later [after Nov. '88] then and wanted me to buy from him at—at his other place of business, which I did").

were not the cause of the plaintiffs' actual later losses. McAnally and Whorton admitted on cross-examination that they were fully aware of the risks involved when they began trading with A.G. Edwards on July 21, 1988. Tr. at 168; *id.* at 240.[17] Even after plaintiffs admittedly knew the full extent of the risk involved, they did not close out their positions with Gildersleeve so as to prevent any further diminution in their financial position. Instead, they continued to purchase commodity futures options contracts through both A.G. Edwards and Gildersleeve, including investments in corn options, which is further evidence that they expected the price of the pre-July 21, 1988 options they held with Gildersleeve to rebound. Therefore, even if the Gildersleeve options had resulted in some paper loss before July 21, 1988, the plaintiffs' election to hold on to them and to invest even more shows plaintiffs sustained no actual loss when they began trading with A.G. Edwards and that with full knowledge of the risks, they expected the price of corn futures options to rise. The fact that the plaintiffs lost their investments when the prices had not risen by the time their options expired was not caused by their reliance on Gildersleeve's misrepresentations which occurred at the opening of their accounts with his firm.

Plaintiffs argue that they were "caught up in the market," and their trades with A.G. Edwards and their additional trades with Gildersleeve were simply desperate attempts to recoup losses that they never would have incurred if they were aware of the risks initially.[18] Assuming that their "caught-up-in-the-market" theory could be consistent with their statements that they never would have invested if they were aware of the risks,[19] the evidence at trial does not support a reasonable jury conclusion that plaintiffs traded with A.G. Edwards to recoup losses. Plaintiffs began trading with A.G. Edwards on July 21, 1988, but they sustained no actual losses on trades with Gildersleeve until their September options expired on August 22, 1988. Tr. at 205 (testimony of Whorton); *id.* at 151 (testimony of McAnally). It is unreasonable to conclude that plaintiffs traded with A.G. Edwards to recoup losses that they had not yet actually sustained.

### III. CONCLUSION

Because we hold as a matter of law that no reasonable jury could have concluded that plaintiffs relied on the alleged misrepresentations of Gildersleeve, we affirm the judgment of the district court.

LAY, Senior Circuit Judge, dissenting.

I would reverse the judgment as a matter of law granted by the district court or at the very least order a new trial. I agree with the majority that the district court erred in finding that the defendant had not materially and knowingly misrepresented the risk involved in investing. I disagree, however, with the majority's conclusion that the misrepresentations could not, as a matter of law, have been the cause of the plaintiffs' losses.

---

17. Our holding is not inconsistent with *Myron v. Hauser*, 673 F.2d 994, 1006 (8th Cir.1982). In *Myron*, this court held that a disclosure statement received by plaintiff after he had ceased trading commodity options could not cure misrepresentations upon which he had earlier relied. In this case, however, plaintiffs continued to buy commodity futures options *after* they were aware of the falsity of any misrepresentation by Gildersleeve. By continuing to trade, plaintiffs remained eligible to earn healthy returns but risked substantial losses of which they were fully aware.

18. Plaintiffs' expert testified that he believed that plaintiffs were caught up in the market. Tr. at 307–08, 311. The record reflects that the price of December corn options rose through June and the price of September corn options fell through-

out July. The record does not reflect plaintiffs' relative paper positions as of July 21, 1988, but the record does reflect that on July 21, 1988—the same day that plaintiffs acknowledged that they were aware of the risks involved in commodity futures options trading and began trading with A.G. Edwards—plaintiffs sold heating oil options, that they had purchased through Gildersleeve six days earlier, at a profit of $1720 each.

19. Plaintiffs' "caught-up-in-the-market" theory also is problematic because it extends their original broker's potential liability. If plaintiffs sustained losses at A.G. Edwards, which they did, there is no reason why a jury that determines that Gildersleeve's misrepresentations drove plaintiffs to another broker to recoup losses could not also hold Gildersleeve liable for these losses. We find this result unreasonable.

Numerous circuits have held that downplaying the risks of investing can constitute a material misrepresentation sufficient to subject a broker to liability under the Commodity Exchange Act, 7 U.S.C. §§ 1–26 (1988). In *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir.1986), the Second Circuit held that it was improper for the district court to dismiss a complaint that alleged that the broker of the plaintiff's discretionary commodities account had "misrepresent[ed] the degree of risk and highly speculative nature of commodities trading when he reassured appellant that commodities trading would be a safe, non-speculative investment," *id.* at 110. In *Clayton Brokerage v. CFTC*, 794 F.2d 573 (11th Cir.1986) (per curiam), the court flatly stated that "[m]isrepresentations about risk ... subject a broker to liability under § 4b [of the CEA]," *id.* at 578. The Fifth Circuit, while concluding that there was no misrepresentation in the case at hand, agreed that "the risk inherent in trading commodities is a material fact and that misrepresentations or omissions in this regard may subject a broker to liability under § 4b." *Puckett v. Rufenacht, Bromagen & Hertz, Inc.*, 903 F.2d 1014, 1018–19 (5th Cir.1990). Similar statements were made by the Sixth Circuit in *First National Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir.1987), and by the First Circuit in *Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28, 34 (1st Cir.1986). While the Eighth Circuit does not appear to have held specifically that misrepresentations of risk are actionable, in *Myron v. Hauser*, 673 F.2d 994 (8th Cir. 1982) (McMillian, J.), this Court upheld the Commodity Futures Trading Commission's determination that the defendant, a broker of sugar options, was liable for misrepresentations that included "minimiz[ing] the risk involved in commodity options investment, [and] [making] misleading representations of the profit potential," *id.* at 1006 n. 21.

On this basis, it seems difficult to say that as a matter of law, there was no misrepresentation of a material fact by Mr. Gildersleeve. The jury heard testimony from the plaintiffs that Gildersleeve had downplayed the risks and maximized the profit potential throughout their dealings. I agree with the majority that a reasonable jury could therefore have concluded that Gildersleeve had improperly minimized the risks of investing, and that he did so knowing the statements were false and with the intent to induce reliance.

Where I differ with the majority, however, is in its conclusion that even though Gildersleeve knowingly made the material misrepresentations, with the intent to induce the plaintiffs to invest in commodities futures options, the plaintiffs failed to prove that the misrepresentations were the proximate cause of their eventual losses. The majority finds this element of the plaintiffs' claim lacking because "reasonable persons could not differ as to the conclusion to be drawn from plaintiffs' continued trading with A.G. Edwards and Gildersleeve after plaintiffs were aware of the risks." *Ante* at 1499.

With all due respect, I fail to see how a person who realizes he has been defrauded only *after* the fraud takes place can be precluded as a matter of law from asserting reliance at the time of the initial fraud. The majority's reasoning does not make much sense, and it is at odds with this Court's precedent as well as that of other circuits.

In *Myron*, we stated that "disclosure *following* the sale of the commodity options constitutes no disclosure at all and would not cure or correct the misrepresentations made by [defendant]." 673 F.2d at 1006. In *Clayton Brokerage*, the Eleventh Circuit amplified this view, holding that "until a customer *learns* of the risk of trading, his or her continued trading is premised on reliance upon the failure to disclose or misrepresentations about the risk involved, and the broker will be liable for losses resulting therefrom." 794 F.2d at 579. At a minimum, these statements suggest that Gildersleeve should be held liable for losses resulting from the options purchased before the plaintiffs learned of the risks, which their testimony indicates was by the time they began trading with A.G. Edwards on July 21, 1988.

The *Clayton Brokerage* court went further, however, rejecting the defendant's argument, similar to that advanced here, that whatever the nature and effect of the defendant's initial misrepresentations, there was no proxi-

mate cause for the plaintiff's eventual losses because the plaintiff must have learned about the risks of commodity futures trading by watching his account balance fluctuate. *Id.* at 578. The court stated that given the defendant's continued downplaying of the risks throughout the life of the account, it was "unwilling to conclude, as a matter of law, that [plaintiff] should have seen through [defendant's] excuses and assurances to understand that the losses he had experienced reflected the true risk of commodity futures trading." [1] *Id.* at 580. I believe a similar conclusion is warranted here.

The majority states that:

even if the Gildersleeve options had resulted in some paper loss before July 21, 1988, the plaintiffs' election to hold on to them and to invest even more shows plaintiffs sustained no actual loss when they began trading with A.G. Edwards and that with full knowledge of the risks, they expected the price of corn futures options to rise.

*Ante* at 1501. Yet the plaintiffs' testimony indicates that Gildersleeve constantly reassured them that they would make money.[2] In *First National Monetary Corp.*, the Sixth Circuit rejected the argument that there was no proximate cause where the plaintiff had learned of the risks of commodities investing two months before he got out of the market. 819 F.2d at 1340–41. The court upheld the CFTC's determination that the plaintiff's decision to stay in the market after he had learned of the risks "was caused by [the defendant's] 'lulling conduct'—his continued assurances that [plaintiff] was suffering only 'paper losses' and his predictions that the market was about to turn around." *Id.* at 1341. These assurances bear a striking re-

semblance to those Gildersleeve is alleged to have made to the plaintiffs.

If nothing else, these cases suggest that the question of proximate cause is a question of fact that should be left to the jury. A reasonable jury could have found on the basis of the evidence presented that the plaintiffs reasonably relied on Gildersleeve's misrepresentations and that they suffered losses as a result.

Finally, I am troubled that in disregarding the jury's verdict, the majority discusses and finds "instructive" the standard for affirming a grant of judgment as a matter of law as applied in *Greenwood v. Dittmer*, 776 F.2d 785 (8th Cir.1985). The majority apparently feels that *Greenwood* is analogous to the situation here, although it seems to me to be quite distinguishable. In *Greenwood*, this Court affirmed a j.n.o.v. for the defendant brokers because they were found to be investing their own money in accordance with the advice they were giving to the plaintiff—thus indicating, contrary to the jury's verdict, that their advice was given in good faith. I do not agree with the majority's view that "[s]imilarly, the only conclusion a reasonable jury could have reached, in light of the plaintiffs' post-July 21, 1988 trades with A.G. Edwards and Gildersleeve, is that Gildersleeve's pre-July 21, 1988 misrepresentations were not the cause of the plaintiffs' actual later losses," *ante* at 1500–01 (emphasis added). There is nothing in this case to suggest that Gildersleeve did anything, like the defendants in *Greenwood* did, that would contradict what the jury found. Indeed, the evidence fully supports the conclusion that Gildersleeve acted only to compound his initial

---

1. To be sure, the court in *Clayton Brokerage* also acknowledged that "[t]he CFTC and certain courts have held that a claimant who suffers losses after learning of the risk of trading cannot recover for earlier reliance upon misrepresentations about risk." 794 F.2d at 578–79. Subsequently, in *Puckett*, the Fifth Circuit applied this language to deny recovery to a plaintiff who had continued to trade S & P Index contracts after he had, in the court's view, learned of the risks of such trading by losing $65,000 in one day. 903 F.2d at 1020. Even if we were to adopt this reasoning, that should only prevent the plaintiffs in the present case from recovering for the trades made after they admitted knowledge of the risks.

The principles enunciated in *Myron* and *Clayton Brokerage* would remain applicable to the earlier trades. At most then, this would require a new trial for a redetermination of damages, not a vacation of the total verdict.

2. For example, McAnally testified that on numerous occasions when he told Gildersleeve he was getting scared by the declining market, Gildersleeve told him: "Don't worry about it. You know, the price will rebound. You're going—going to make money." Tr. at 115. Gildersleeve also allegedly told them that to "hit back is the only [way] you can regain." Tr. at 148.

misrepresentations, by repeatedly reassuring the plaintiffs that they would make money. In my view, then, the jury's verdict was not "at war with the undisputed facts," *see ante* at 1500, and should be reinstated.

I therefore dissent.